2024 IL App (1st) 220419

No. 1-22-0419

Opinion filed June 5, 2024

Third Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 03 CR 5227 |
| | ) | |
| JASON JOHNSON, | ) | Honorable |
| | ) | Michael B. McHale, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE LAMPKIN delivered the judgment of the court, with opinion.
Justices D.B. Walker and R. Van Tine concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant Jason Johnson was convicted in 2009 of four counts of first degree murder and received a mandatory sentence of natural life imprisonment. In 2021, the circuit court dismissed his 2019 petition for postconviction relief at the second stage of proceedings under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)).

¶ 2    On appeal, defendant argues he made a substantial showing that (1) trial counsel provided ineffective assistance by not supporting defendant's motion to suppress his 2003 statements to the police with evidence that two detectives had coerced confessions from suspects from 1985 to 1991

and 2000 to 2002, respectively, demonstrating a pattern and practice of coercing confessions from suspects, and (2) in the alternative, assuming that the aforesaid evidence could not have been discovered through due diligence prior to final judgment, then defendant's statements were coerced and their use violated his right against self-incrimination, and newly discovered evidence excuses *res judicata* and warrants reconsideration of his claim.

¶ 3 Although defendant's appellate brief also raises the claim that his natural life sentence violates the Illinois Constitution's proportionate penalties clause, he concedes in his reply brief that this claim is foreclosed by recent caselaw.

¶ 4 For the reasons that follow, we reverse the judgment of the circuit court and remand this matter for an evidentiary hearing under the third stage of the Act.

¶ 5                                    I. BACKGROUND

¶ 6 On January 3, 2003, Prescott Perry, his daughter Sarah Perry, her boyfriend Ronald Ryals Sr., and the couple's two-year-old child Ronald Ryals Jr. were found shot to death inside their home located on South Michigan Avenue in Chicago. The Perry family's dog had also been shot and killed. During the investigation into the murders, defendant, who was 18 years old at the time, spoke to law enforcement officials and made a series of statements in which he admitted to his role in the quadruple homicide alongside Emmanuel Phillips, who was defendant's longtime friend and the victims' neighbor. Following defendant's admission, he was charged with multiple counts of first degree murder, home invasion, armed robbery, and residential burglary.

¶ 7                                A. Pretrial Proceedings

¶ 8 Following his arrest, defendant tried to suppress his inculpatory statements. First, he moved to quash his arrest, alleging that the police lacked probable cause to arrest him and seeking to

suppress all evidence obtained by the authorities as a direct or indirect result of his purportedly unlawful arrest, including his inculpatory statements. Second, he moved to suppress his inculpatory statements, which he alleged were the direct result of "physical, psychological and mental coercion illegally directed against" him by Chicago police officers. Specifically, defendant alleged that law enforcement officials handcuffed him to a wall, took away his coat and shoes, kept him in custody and deprived him of sleep for four days, and failed to provide him with an adequate amount of food during his time at the Area 2 police station. Defendant further alleged that three different law enforcement officers physically assaulted him and/or threatened to physically assault him. Specifically, he alleged that Detective Anthony Maslanka handcuffed and hit him at his house before taking him against his will to Area 2. He further alleged that Detective Maslanka threatened to "bust [his] s***" if defendant failed to cooperate. Later, at Area 2, Detective Maslanka allegedly "smacked" defendant in the face when he failed to answer a question. Defendant further alleged that another officer, Detective David Fidyk, punched, kicked, and choked defendant, displayed a firearm and insinuated that he could shoot defendant in the interview room, and showed him very disturbing photographs of the crime scene. Finally, defendant alleged that a third officer, whom he believed to be Sergeant Daniel Brannigan, threatened defendant with "physical violence" if he did not sign a court-reported inculpatory statement.

¶ 9                              1. Motion to Quash Arrest Hearing

¶ 10    The trial court first presided over a hearing on defendant's motion to quash his arrest and suppress evidence, which commenced in May 2007. The court heard evidence about the events that unfolded after the January 2003 quadruple homicide that led to defendant's initial encounter

with police on February 6, 2003, and to the series of statements he provided in the days that followed.

¶ 11 The State's evidence showed that law enforcement officials commenced a large-scale investigation after the bodies of the four victims were discovered in their home. Although there were no immediate suspects, police found somewhat unusual ballistics evidence at the scene. Specifically, they observed a number of unique frosty-colored 9-millimeter shell casings throughout the residence instead of the more common silver or brass-colored casings.

¶ 12 A breakthrough in the case occurred on February 6, 2003, when police responded to a shooting at the bungalow located next door to where the four bodies had been found. Roosevelt Phillips, the Perry family's neighbor, had been shot and killed, and police noticed the same frosty-colored shell casings present at the scene. Police also discovered a note written by Roosevelt's son, Emmanuel, in which he claimed he was the individual responsible for his father's murder as well as the murders of his four next-door neighbors. Emannuel also professed an intent to kill himself in his letter. A manhunt for Emmanuel ensued, and his mother suggested that the authorities speak to defendant, whom she described as her son's "very close friend." She directed them to an apartment complex located on West 71st Street where defendant's mother lived.

¶ 13 Several officers, including Detective Richard Lombard, immediately went to that location and knocked on the door. When defendant's brother Jammel Johnson opened the door part way, the police pushed the door open and entered the apartment with their guns drawn. Jammel went to the police station, where the police asked him about defendant and Emmanuel. Jammel confirmed that his brother and Emmanuel were friends and told the officers that defendant was likely at their stepfather's house located on South Lowe Avenue. Detective Lombard and a team of officers

relocated to that address. Upon their arrival, they observed a man running around inside the house. The officers believed that Emmanuel could be in the home and thus forced entry into the residence. Once inside, they encountered defendant on the second-floor landing. Detective Lombard handcuffed him and took him over to a couch.

¶ 14 According to the State's witnesses, Detective Lombard uncuffed defendant after ascertaining his identity and explained that they were looking for Emmanuel. Defendant indicated that he was afraid of Emmanuel and agreed to accompany police to Area 2 to help them locate him; however, defendant informed Detective Lombard that he wanted to leave his house in handcuffs so people did not think he was cooperating with the authorities. Accordingly, Detective Lombard handcuffed defendant and transported him to Area 2. Detective Lombard subsequently removed defendant's handcuffs when they arrived at the station. At that time, police had no reason to believe that defendant was involved in the quadruple homicide.

¶ 15 At Area 2, defendant spoke to a number of officers including Detectives John Bloore, Maslanka, and Fidyk. Detectives Bloore and Maslanka first interviewed defendant about 1 p.m. They did not provide defendant with *Miranda* (*Miranda v. Arizona*, 384 U.S. 436 (1966)) warnings at that time. During the conversation, defendant acknowledged that he and Emmanuel were longtime friends and indicated that he had spoken to Emmanuel a week earlier and Emmanuel had confessed that he had killed four people. Emmanuel indicated that he wanted defendant to run away with him, but defendant declined, and Emmanuel then threatened to kill defendant and members of defendant's family. Defendant indicated that he was aware Emmanuel owned firearms and directed police to a hiding place in Emmanuel's room where he kept them. After police confirmed the hiding place, Detectives Bloore and Maslanka conducted a second interview with

defendant about 5 p.m. At the outset of the interview, Detective Bloore advised defendant of his *Miranda* rights, which defendant waived. During the conversation, defendant was unable to provide a consistent account of his whereabouts on New Year's Eve and New Year's Day. He also claimed that he had not been in contact with Emmanuel recently, but phone records contradicted his claims, which caused police to become "more suspicious" of him. They conversed on and off until about 11:30 p.m., at which point the detectives' shifts ended. Detective Bloore testified that while defendant was at Area 2 on February 6, 2003, he was uncuffed and was provided with food, drink, and bathroom breaks.

¶ 16   Detective Fidyk testified that he first spoke to defendant about 12:30 a.m. on February 7 in an unlocked interview room. Defendant essentially recounted what he had told Detectives Bloore and Maslanka and acknowledged that he knew Emmanuel was responsible for the murders. Detective Fidyk had a second conversation with defendant about 2 p.m. that day. Defendant spoke about his close friendship with Emmanuel and provided further details about Emmanuel's involvement in the murders. According to defendant, Emmanuel and a cousin named "Bee" went to the Perrys' house to steal one of Prescott's guns and Emmanuel ended up killing everybody. Defendant told Detective Fidyk that Emmanuel asked him to get rid of a bag of bloody clothes at some point, but defendant refused because he had recently been released from jail. Defendant also relayed that he was aware Emmanuel had been planning on killing his own father.

¶ 17   Detectives Bloore and Maslanka also interviewed defendant on February 7. During the interview, defendant admitted that he acted as the "look out" during the murders, and at that point, he was no longer free to leave Area 2. He further relayed that Emmanuel had a "hit list" and was planning on killing a woman who was responsible for defendant's recent burglary arrest.

Defendant continued to provide additional statements, including a handwritten statement on February 8, 2003, and a court-reported statement on February 9, 2003.

¶ 18   Defendant provided his own account of the events of February 6, 2003, and the days that followed. He testified that he returned from work early in the morning and went to sleep but was awakened by "banging" sounds coming from the side door. He got up to investigate, grabbed his keys, and began walking toward the front of the house. As he did so, the door to the kitchen was kicked in and three armed individuals entered the house. Initially, defendant did not know the men were police officers because they were not wearing uniforms. The men ordered him to "freeze" and defendant complied and raised his hands above his head. The officers then cuffed him and threw him on the living room couch. One of the officers remained with defendant in the living room while other officers searched his residence. Defendant did not recall the name of the officer who remained with him in the living room, but described him as a tall, older, white male with salt and pepper hair. The officer asked him if he knew where Emmanual could be found, and defendant responded that he did not. The officer repeated the question several more times and defendant insisted he did not know where Emmanual could be found. The officer then smacked defendant's face with an open hand. At that point, another officer gave defendant some clothes to change into and advised him that they were taking him to the police station because they believed that he knew where Emmanual could be found. The older officer who had struck defendant's face then told him that they were going to play a game called "if you lie to us, we're going to bust your s***." Defendant testified that he was not asked if he wanted to accompany the officers to the police station and did not volunteer to assist them in their efforts to locate Emmanuel. Defendant was led out of his house in handcuffs, put into an unmarked police car, and transported to Area 2.

¶ 19    Upon his arrival at Area 2, defendant was taken to an interview room. Officers removed his shoes and coat and cuffed him to a metal ring affixed to the wall. He testified that he remained cuffed the entire time he was at the station except for when he was taken to the bathroom and a polygraph exam. Defendant acknowledged that he spoke to several officers and made a series of statements while he was at Area 2. He testified that the officer who smacked his face at his house was one of the first officers he spoke to at the station. Despite the officer's initial threat to "bust [defendant's] s***," defendant stated that the officer never struck him again. Defendant spoke to two different officers later that day and testified that neither of them advised him of his *Miranda* rights. During the interviews, defendant acknowledged that he and Emmanuel were longtime friends and that he had recently lived with Emmanuel and his family for a while but reiterated that he did not know where Emmanual could be found. Defendant further acknowledged that he and Emmanual would call each other but told the officers that he had not spoken to Emmanual in about a week and a half.

¶ 20    In October 2007, the trial court ruled that defendant was arrested when the police forcibly entered his home on February 6, 2003, and the police lacked probable cause to effectuate a lawful arrest at that time. The trial court thus initially granted defendant's motion to quash arrest and set a date for an attenuation hearing. However, in August 2008, the court found that defendant's statements were sufficiently attenuated from his unlawful arrest.

¶ 21                                    2. Suppression Hearing

¶ 22    In April 2009, the court presided over a hearing on defendant's motion to suppress his statements. At the State's request, the court took judicial notice of the testimony from the prior proceedings. The court found that based on the prior testimony, the State had met their initial

burden of establishing the voluntariness of defendant's statements and that the burden had shifted to him to provide evidence that his statements were involuntary.

¶ 23    Joshua Waller and Felicia Ball, defendant's half-siblings, testified that they visited him at the jail on February 15, 2003, and both noticed marks on his face and neck. They also both observed discoloration and bruising around one of his eyes and "choke marks" and scratches on his neck. According to Waller, the injuries to defendant's neck appeared to be a "[c]ouple days old." During their visit, Waller and Ball also observed some type of injury to defendant's tongue. When Ball asked defendant about his injuries, he told her the police had "beat him up." Neither Waller nor Ball reported or voiced any complaints about defendant's injuries to the authorities. Ball viewed photographs taken of defendant on February 10, 2003, and acknowledged that they did not show any visible injuries to his face or neck.

¶ 24    Defendant again described how the police forcibly entered his residence and took him to Area 2. This time, however, he detailed new allegations of abuse and identified the officers who perpetrated the abuse. Specifically, he identified Detective Maslanka as the officer who threw him on his couch, "smacked" his face, and threatened to "bust [his] s***" if he lied. He was unable to recall, however, exactly which cheek Detective Maslanka struck. Defendant testified that after he was transported to Area 2, Detectives Maslanka and Bloore spoke to him and inquired into Emmanuel's whereabouts. Unlike his previous testimony, where he denied Detective Maslanka ever touched him at Area 2, defendant now asserted that Detective Maslanka "smacked" him a "few more times" when he was unable to direct the detectives to Emmanuel's location. Defendant testified that Detectives Maslanka and Bloore returned to speak with him later that evening and that Detective Maslanka again "put [his] hands on" defendant and "slapped" him when he was

unable to provide them with any useful information. Although Detective Bloore was present when Detective Maslanka smacked him, defendant testified that Detective Bloore never touched him. Defendant stated that he did not have any further interaction with Detective Maslanka after February 6, 2003.

¶ 25     Defendant testified that he had several conversations with Detective Fidyk, who treated him the same way as Detective Maslanka but worse. According to defendant, Detective Fidyk wanted him to make a formal statement and slapped, choked, kicked, and threatened him to compel him to do so, which made him "feel afraid." Defendant further testified that he was sitting on a bench and Detective Fidyk put his leg up on the bench, exposing his gun in his ankle holster. Defendant flinched or jumped back, and Detective Fidyk told him not to jump like that because Detective Fidyk could shoot defendant. Detective Fidyk also showed defendant a crime scene photo of Ronald Jr. and ordered defendant to reenact the photo by lying down on the floor and facing the wall with his lips on the wall, which made defendant feel "low" and "like [he] wasn't human." When defendant complied with Detective Fidyk's order, he kicked defendant in the back and on the side of his leg. Defendant acknowledged that he had never testified before that Detective Fidyk made him reenact crime scene pictures and that this allegation was not included in his suppression motion. Defendant testified that Detective Fidyk continued to show him "a lot" of photos of the other victims and that seeing those pictures "emotionally wounded" him because he knew each of the victims.

¶ 26     At some point, defendant agreed to speak to an assistant state's attorney (ASA) and provide a handwritten statement, and Detective Fidyk "finished beating" him. Detective Fidyk showed defendant a layout of the house in which the murders had occurred, pointed out areas of the house,

and told him things and what to say during the drafting of his eventual handwritten statement. When defendant ultimately refused to sign the statement, Detective Fidyk and Sergeant Brannigan took him back to an interrogation room and Sergeant Brannigan threatened to "torture" him. Defendant, however, subsequently testified that it was Detective Fidyk who threatened to "torture" him and that Sergeant Brannigan was simply present when Detective Fidyk issued the threat. Defendant acknowledged that the ASA who transcribed his handwritten statement asked him how the authorities had treated him and that he did not report any mistreatment; however, he claimed he did not report the abuse because he feared Detective Fidyk, who was present when the question was asked. Defendant alleged he was never asked about his treatment at the hands of law enforcement officers outside of the presence of detectives. However, defendant later testified that he did not recall a handwritten statement at all, or speaking to the ASA who transcribed it, and had never seen the reported handwritten statement while at the police station.

¶ 27   After declining to sign the handwritten statement, defendant subsequently agreed to provide a court-reported statement to a different ASA the following day. During the statement, defendant testified that he "was kinda" choosing what to say and "kinda wasn't." He explained that Detective Fidyk had him memorize what to say after an earlier beating and remained present for the entire statement. Defendant acknowledged that his signature appeared on each page of the 52-page, court-reported statement but denied that he reviewed the statement before signing it. He also acknowledged that the statement contained a number of corrections and that his initials appeared next to each of the corrections, but denied that he personally initialed the document. In the statement, defendant said that he was treated "fair" at Area 2 and was provided with food, drink, and cigarettes. Defendant testified, however, that his answers were inaccurate. He alleged

that he had not been given anything to eat or drink since he had arrived at Area 2 on February 6th, and that he had "not really" been able to sleep prior to giving the court-reported statement because people kept coming in and out of the interview room.

¶ 28    After he gave the court-reported statement, defendant was transported to jail and processed. Although he was asked if he had any medical problems or if he had sustained any recent trauma, he did not report any of the injuries he purportedly sustained during his time at Area 2. He did, however, seek medical care the next day, because he was experiencing difficulty breathing and swallowing. He also made an incident report on February 11, 2003, in which he alleged that detectives had injured him. He was ultimately referred for treatment for laryngitis and pharyngitis. X-rays did not reveal that he sustained any injuries; however, he was given Motrin for pain. He again sought medical treatment a few days later, and this time he was provided with Tylenol to treat his pain because he was allergic to Motrin.

¶ 29    In rebuttal, the State called ASA Darren O'Brien, who was present for defendant's court-reported statement. ASA O'Brien testified that he arrived at Area 2 sometime after 12:30 p.m. on February 9, 2003. Before he spoke to defendant, ASA O'Brien reviewed police reports and photographs pertaining to the quadruple homicide and conversed with Detective Fidyk. Thereafter, he spoke to defendant in an interview room for about 45 minutes to an hour. Following their preliminary conversation, ASA O'Brien requested a court reporter to meet them at Area 2. ASA O'Brien testified that Detective Fidyk was not present for the entire preliminary conversation; he only appeared "on and off" while ASA O'Brien spoke to defendant. During that conversation, defendant confirmed that he had slept and had been fed.

¶ 30    The court-reported statement took place in a roll call room at Area 2 and started about 4:35 p.m. on February 9, 2003. Detective Fidyk was also present in addition to the court reporter who transcribed the statement. Defendant had no visible injuries to his face, neck, or mouth and never complained of any injuries. Several times, ASA O'Brien spoke to defendant alone and asked how he had been treated by the police, and defendant responded that his treatment had been "fair." Defendant never alleged he suffered abuse at the hands of Detectives Fidyk or Maslanka, or any other officer. The court-reported statement concluded at 5:16 p.m., and the court reporter left to type the statement, which took about four hours. After ASA O'Brien received a copy of the transcribed statement, he sat alone with defendant and reviewed each page of the 52-page statement. Various corrections were made while reviewing the statement, and he and defendant each initialed every correction. ASA O'Brien finished reviewing the statement with defendant sometime about 10:30 or 11 p.m.

¶ 31    Sergeant Brannigan testified that he was one of the officers who went to defendant's residence on February 6, 2003, in an effort to locate Emmanuel. He further testified that Detective Maslanka was not part of that group. Sergeant Brannigan recalled that he was in constant phone contact with Detective Maslanka that day and that Detective Maslanka was at Area 2 interviewing defendant's brother, Jammel, at the time that Sergeant Brannigan and other officers encountered defendant at his stepfather's house.

¶ 32    After the State rested in rebuttal, the trial court denied defendant's motion to suppress his statement, finding that his statements were voluntary and admissible at trial. In so finding, the court concluded that there was "no evidence of physical coercion at the time of the court-reported statement." The court noted that the photographs of defendant did not show that he had any type

of physical injury and deemed defendant's testimony "incredible as it relates to threats and coercion." In contrast, the court found ASA O'Brien's testimony regarding the lack of physical injury to defendant to be "credible." The court further found that the evidence established that defendant had been afforded food, drink, bathroom breaks, cigarettes, and the opportunity to sleep while he was at Area 2. Finally, the court concluded that neither the length of time that defendant spent in custody prior to the statement, nor the investigative techniques utilized by law enforcement officials, caused defendant's will to be overborn.

¶ 33                                    B. Trial

¶ 34     The jury trial commenced in June 2009. The State's evidence established that the bodies of Prescott, Sarah, Ronald Sr., and Ronald Jr. were discovered inside their home on January 3, 2003. Each victim had been shot at close range and sustained gunshot wounds to the head.

¶ 35     Police assigned to process the scene observed two different types of ammunition strewn throughout the residence: 9-millimeter and .22-caliber shell casings. Based on the ballistics evidence and the nature of the crime scene, police believed that more than one perpetrator was responsible for the quadruple homicide. Throughout the month of January 2003, law enforcement officials spoke to neighbors of the victims and pursued various leads, but they did not have any suspects. Emmanuel, who lived with his family next door to the victims, was one of the neighbors police interviewed during their investigation. That conversation took place on January 26, 2003, when Emmanuel's father, Roosevelt, accompanied him to the police station. During that conversation, Emmanuel advised the authorities of the existence of a local four-person robbery crew and speculated that they may have been involved in the murders. Emmanual's tip, however, did not prove fruitful.

¶ 36   The investigation into the quadruple homicide essentially remained stalled until February 6, 2003, when Roosevelt was shot and killed at his home. When police responded to that shooting, they observed distinctive 9-millimeter shell casings that appeared to match those found at the scene of the quadruple homicide next door. Police also discovered a note written by Emmanuel in which he admitted to killing his father and his four next-door neighbors and threatened to kill himself. Emmanuel also claimed in the note that he was the sole perpetrator of the murders.

¶ 37   A search for Emmanuel immediately ensued, and his mother gave the police the address of his "very good" friend, defendant. Defendant was not at the apartment, but his brother Jammel advised them that defendant was most likely at their stepfather's house located on South Lowe Avenue. When officers arrived at the residence, they knocked on the door, but their knocks went unanswered. Instead, the officers observed a man running around inside of the house and forced entry into the residence because they believed that Emmanuel was inside. Once inside the house, they encountered defendant, whom Detective Lombard handcuffed and seated on the couch while other officers searched for Emmanuel. Emmanuel, however, was not in the house; defendant was the only occupant. He was distraught and agreed to accompany police to Area 2 to help them locate Emmanuel. At that time, defendant was the only connection to Emmanuel of whom police were aware.

¶ 38   Once he arrived at Area 2 on February 6, 2003, defendant provided a series of statements to the authorities. Initially, he denied any involvement in the murders but admitted that he and Emmanuel had spoken recently and Emmanuel had confessed that he had murdered his four neighbors and was planning to kill his own father. Emmanuel also said that he was planning on killing Kaneese Sherrod, a woman he blamed for defendant's recent legal troubles, and some

members of the Black Disciples street gang. Defendant further advised the authorities that Emmanuel hid weapons, including a long rifle, a nickel-plated revolver, and a blue steel semiautomatic handgun, behind a loose baseboard in his bedroom. Based on defendant's instructions, police located the loose baseboard but did not find any weapons hidden behind it.

¶ 39    Defendant remained at Area 2 and spoke to the authorities while the manhunt for Emmanuel continued. On February 7, 2003, Sherrod was killed, and shell casings at the scene appeared to match those found at the two other crime scenes. Emmanuel was also implicated in the murder of a man named Patrick Oscar the following day.

¶ 40    On February 8, 2003, defendant agreed to provide a handwritten statement. He spoke to ASA Nancy Nazarian, who transcribed his statement reflecting his involvement in the quadruple homicide. He disclosed that on January 1, 2003, Emmanuel invited him to come to his house and smoke weed. When defendant arrived, he smoked blunts and watched a movie with Emmanuel and another man, "Bee," whom he had met once before. Emmanuel then discussed a plan for the three of them to go next door and steal Prescott's Uzi. Emmanuel believed that Prescott was not home and advised defendant that he needed to ring the doorbell because Sarah did not like Emmanuel and would not open the door for him. Also, Sarah did not know Bee and would not open the door for him. Emmanuel then put on gloves and retrieved a rifle and a handgun that he had secreted behind a baseboard in his bedroom, and the three men waited for Emmanuel's father to leave for work.

¶ 41    After Roosevelt left the house to go to work, defendant, Emmanuel, and Bee walked next door. Emmanuel was armed with the handgun and Bee was armed with the rifle. All three men wore gloves. Once they arrived at the Perry residence, defendant rang the doorbell while

Emmanuel and Bee stood on opposite sides of the door where they could not be seen. Unexpectedly, Prescott opened the door, and as soon as he did so, Emmanuel rushed past defendant, struck Prescott with the gun, and then shot him in the stomach. Emmanuel then walked toward Sarah's first-floor bedroom, and defendant and Bee followed, dragging Prescott with them. Upon entering Sarah's room, Emmanuel turned on the lights and shot Sarah, who was on the bed with Ronald Sr. At that point, defendant walked out of the room and sat in the hallway. He heard the baby start to cry and heard several more shots.

¶ 42    Emmanuel then dragged Prescott up to the second floor, where Prescott's bedroom was located, and Bee followed. Defendant remained on the first floor and heard Emmanuel yell at Prescott and demand to know where he kept his guns. Defendant saw Prescott's dog run up the stairs and then heard more gunshots. Emmanuel then ran down the stairs with an Uzi in one hand, and his own handgun in the other. Emmanuel put both weapons in a black nylon bag he had brought to the Perry's house. The three then returned to Emmanuel's house where Emmanuel put his bloody clothes in a garbage bag and hid Prescott's Uzi under his bed. Bee put the rifle, which now had a broken handle, in the garbage bag. The three men then went to sleep. The next morning Emmanuel asked defendant to take the garbage bag when he left, but defendant refused and Emmanuel disposed of the bag in a garbage can behind his house. A few weeks later, Emmanuel informed defendant that he had spoken to police investigating the murders and that he was planning on killing his own father and Sherrod.

¶ 43    Although defendant advised ASA Nazarian that his statement was truthful and given freely and voluntarily, he declined to sign the statement when given the opportunity to do so.

¶ 44    Thereafter, on February 9, 2003, defendant agreed to speak to ASA O'Brien and Detective Fidyk and provide a court-reported statement. Once the court reporter transcribed defendant's statement, ASA O'Brien reviewed the transcript with defendant. Defendant made several corrections to the statement, initialed each correction, and signed each page of the statement. His court-reported statement largely mirrored his earlier handwritten statement but included some differences. For example, he reiterated that the motive for forcibly entering the Perry's house was to steal Prescott's Uzi and admitted that he was the one who rang the doorbell. This time, however, he identified "Bee" as Andrew Shubert. Shubert was Prescott's brother and went by the nickname "Benji." (Police never found a connection between Shubert and Emmanuel, and Shubert was never charged with any crimes related to the murders.) Defendant stated that Benji was the one who initially shot Prescott with Emmanuel's 9-millimeter gun when Prescott opened the door. Emmanuel, who was armed with the rifle, and Benji then switched guns. Emmanuel entered Sarah's room with the 9-millimeter gun and shot and killed her, Ronald Sr., and Ronald Jr. Emmanuel then shot and killed Prescott and the Perry family's dog in Prescott's upstairs bedroom and descended the stairs with Prescott's Uzi. Defendant explained that the prior discrepancies resulted from fear and attested to the veracity of the court-reported statement.

¶ 45    February 9, 2003, was also the day that Emmanuel fatally shot himself following a standoff with law enforcement at a motel. Various pieces of evidence were collected from the scene, including the gun Emmanuel used to kill himself.

¶ 46    Ballistics evidence established that at least two different firearms were fired at the scene of the quadruple homicide. The ballistics evidence further established that the gun Emmanuel used

to kill himself was one of the weapons used at the scene of the quadruple homicide. The weapon was also used to kill Emmanuel's father, Sherrod, and Oscar.

¶ 47    After the State rested, the defense called a series of witnesses to show that no forensic evidence definitively linked defendant to the quadruple murder. Specifically, the defense established that defendant's fingerprints were not found at the scene and that clothing recovered from him did not contain blood stains or test positive for the presence of gunshot residue. Defendant elected not to testify.

¶ 48    After hearing closing arguments, the jury returned with a verdict finding defendant guilty of four counts of home invasion and four counts of first degree murder.

¶ 49                              C. Sentencing Hearing

¶ 50    At the sentencing hearing in August 2009, the parties reviewed defendant's presentence investigation report (PSI), which reflected that he had a "normal childhood"; "good" relationships with his mother, stepfather, and siblings; several prior theft convictions; no mental health issues; and a history of regular alcohol and marijuana usage. The State also published victim impact statements written by the mothers of Sarah and Ronald Sr. Defendant, in turn, published several letters written on his behalf by various people including his family members, an employee of a housing cooperative where he resided as a child, and a prison chaplain.

¶ 51    Thereafter, the parties offered arguments in aggravation and mitigation. In aggravation, the State observed that defendant was subject to a statutorily mandated natural life sentence because he had been convicted of murdering four people (see 730 ILCS 5/5-8-1(a)(1)(c)(ii)  (West 2002) (mandating that a defendant convicted of murdering more than one victim be sentenced to a term of natural life imprisonment where the death penalty is not otherwise imposed)) and argued that

the sentence was "richly deserve[d]" given the "horrific" and "heinous" nature of the killings. In mitigation, defendant's counsel acknowledged the statute, but argued that a natural life sentence was not appropriate "constitutionally speaking," and instead asked the court to "impose a term of years."

¶ 52 Ultimately, after considering the PSI, the victim impact statements, statutory aggravating and mitigating factors, as well as the parties' arguments, the trial court acknowledged the governing statute and sentenced defendant to natural life imprisonment.

¶ 53 Defendant filed a motion to reconsider his sentence. In his filing, he cited his age and "the fact that there was no evidence that he was anything but accountable" for the offenses and argued that his life sentence was excessive and violated the Illinois Constitution's proportionate penalties clause. The trial court, however, denied the motion, explaining that defendant was found guilty of murdering four people and that the statute mandating that he receive a sentence of life imprisonment was "clear."

¶ 54                                   D. Direct Appeal

¶ 55 Defendant appealed, arguing that the trial court erred in finding that his inculpatory statements were attenuated from his illegal arrest and in allowing the State to introduce other crimes evidence at trial. On review, this court rejected defendant's claims and affirmed his conviction. *People v. Johnson*, 2013 IL App (1st) 093005-U. In doing so, this court concluded that the trial court erred when it found that defendant had been arrested absent probable cause and, as a result, found it unnecessary to review the trial court's attenuation ruling. *Id.* ¶¶ 61-62. This court further found that the trial court properly admitted the other crimes evidence. *Id.* ¶ 72.

¶ 56                                    E. Postconviction Proceedings

¶ 57    Defendant, through private counsel, filed the 2015 postconviction petition and 2019 amended postconviction petition at issue in this appeal. Relevant to this appeal, defendant alleged that trial counsel was ineffective for failing to introduce evidence at his suppression hearing—*i.e.*, that Detectives Maslanka and Fidyk had a pattern and practice of abusing suspects—to support defendant's claim that his inculpatory statements were coerced. He further alleged that the evidence showing the detectives' pattern of abusive behavior warranted a reexamination of his motion to suppress. Defendant also challenged the constitutionality of his natural life sentence.

¶ 58    Defendant's petition and amended petition included the following evidence as to Detective Maslanka: (1) an excerpt from the 2006 Report of the Special State's Attorney (2006 Report) (Edward J. Egan & Robert D. Boyle, Report of the Special State's Attorney Appointed and Ordered by the Presiding Judge of the Criminal Division of the Circuit Court of Cook County in No. 2001 Misc. 4 (July 19, 2006), https://www.aele.org/law/2006LROCT/chicagoreport.pdf [https://perma.cc/M5FQ-Y9NS]), which described Detective Maslanka's abuse of Alfonzo Pinex in 1985, (2) a transcript excerpt from the May 2009 postconviction petition hearing in People v. Brown, No. 90 CR 23997, where Detective Maslanka invoked his fifth amendment right against self-incrimination when questioned about past incidents of alleged abuse, (3) a May 2013 Torture Inquiry and Relief Commission (TIRC) case disposition regarding the claim of Tony Anderson (*In re Claim of Anderson*, Ill. Torture Inquiry & Relief Comm'n Cl. No. 2011.014-A (2013)), which discussed Detective Maslanka's abusive conduct in 1990 and referenced 14 other incidents of alleged abuse from 1984 to 1991 according to the Office of Professional Standards (OPS), and

(4) two court opinions, *People v. Clemon*, 259 Ill. App. 3d 5 (1994), and *People v. Coleman*, 206 Ill. 2d 261 (2002), which discussed allegations of abuse involving Detective Maslanka.

¶ 59    Regarding the evidence against Detective Fidyk, defendant attached to his petition a 2018 TIRC case disposition (*In re Claim of Muhammad*, Ill. Torture Inquiry & Relief Comm'n Cl. No. 2014.256-M (2018)), which discussed allegations of physical coercion made by Abdul M. Muhammad against Detective Fidyk and other officers in 1999. This 2018 TIRC case disposition also referenced a 2005 OPS complaint by Clinton Dixon that alleged Detective Fidyk participated in torture to secure a confession in 2002, and a 2014 complaint to the Independent Police Review Authority (IPRA) by Lavell Cotton against Detective Fidyk alleging police torture.

¶ 60    At second-stage postconviction proceedings, the State filed a motion to dismiss. Following a hearing, the trial court concluded that defendant failed to make a substantial showing of a constitutional violation and dismissed the petition. In doing so, the court found that the evidence on which defendant relied to establish that Detectives Maslanka and Fidyk had a pattern of abusive behavior was not relevant or material and would not have been admissible. As such, defendant was unable to meet his burden to show either defective performance by counsel or prejudice. The court also found that defendant was unable to meet the legal standard required to reopen his suppression motion. Finally, the court concluded that defendant failed to make a substantial showing that his natural life sentence violated proportionate penalties principles.

¶ 61    This appeal followed.

¶ 62           II. ANALYSIS

¶ 63 This appeal is governed by the framework set forth in the Act. See 725 ILCS 5/122-1 *et seq.* (West 2018). The Act provides a mechanism pursuant to which criminal defendants who have suffered a substantial violation of their constitutional rights at trial may obtain relief. *People v. Edwards*, 197 Ill. 2d 239, 243-44 (2001).

¶ 64 Postconviction proceedings are not a substitute for a direct appeal; rather, the Act simply "offers a mechanism for a criminal defendant to assert a collateral attack on a final judgment." *People v. Robinson*, 2020 IL 123849, ¶ 42. As such, all issues that were previously decided on direct appeal are *res judicata*, and all issues that could have been raised on direct appeal are forfeited. *People v. Allen*, 2015 IL 113135, ¶ 20. To prevail on a claim for postconviction relief filed pursuant to the Act, "a defendant must show that he has suffered a substantial deprivation of his federal or state constitutional rights in the proceedings that produced the conviction or sentence being challenged." *People v. Pendleton*, 223 Ill. 2d 458, 471 (2006).

¶ 65 The Act provides for three distinct stages of review. *People v. Knapp*, 2020 IL 124992, ¶ 43. At the second stage, which is at issue in this appeal, counsel may be appointed to represent the defendant, and the State may respond to the filing with an answer or a motion to dismiss. 725 ILCS 5/122-2.1, 122-4, 122-5 (West 2018); *People v. Greer*, 212 Ill. 2d 192, 204 (2004). The defendant bears the heightened burden of making a substantial showing of a constitutional violation. *Allen*, 2015 IL 113135, ¶ 22. To ascertain whether the defendant has satisfied this burden, the trial court will examine the legal sufficiency of the petition and any accompanying documentation and ascertain "whether the allegations in the petition, liberally construed in favor of the [defendant] and taken as true, are sufficient to invoke relief under the Act." *People v.*

*Sanders*, 2016 IL 118123, ¶ 31. Although the court does not engage in any fact-finding or make credibility determinations at this stage, the court need not accept as true facts that are "positively rebutted by the record." *People v. Johnson*, 2017 IL 120310, ¶ 14. Only if the defendant satisfies his burden of making a substantial showing of a constitutional violation will the petition be advanced to a third-stage evidentiary hearing. *Allen*, 2015 IL 113135, ¶ 22. Absent such a showing, the petition will be dismissed. *People v. Bailey*, 2017 IL 121450, ¶ 18. The second-stage dismissal of a postconviction petition is subject to *de novo* review. *People v. Dupree*, 2018 IL 122307, ¶ 29.

¶ 66                      A. Ineffective Assistance of Counsel at Suppression Hearing

¶ 67    Defendant argues that his postconviction petition made a substantial showing that trial counsel was ineffective for failing to introduce evidence in support of his suppression motion that Detectives Maslanka and Fidyk had a pattern and practice of coercing confessions from suspects.

¶ 68    The State responds that the evidence on which defendant relies largely depicts unsubstantiated, stale claims of abuse that are dissimilar to his own claims. Accordingly, the State argues that the documents hold little relevance and that defendant failed to make a substantial showing that trial counsel's performance was deficient for failing to attempt to introduce them.

¶ 69    A defendant who raises an ineffective assistance of counsel claim must satisfy the two-prong test promulgated in *Strickland v. Washington*, 466 U.S. 668, 694 (1984). Specifically, the defendant must show that counsel's performance was objectively unreasonable and that there is a reasonable probability that, but for counsel's unreasonable performance, the result of the underlying proceeding would have differed. *Id.*; *People v. Albanese*, 104 Ill. 2d 504, 525-26 (1984). "To satisfy the deficient performance prong of *Strickland*, a defendant must show that his counsel's performance was so inadequate 'that counsel was not functioning as the "counsel"

- 24 -

guaranteed by the sixth amendment.' " *Dupree*, 2018 IL 122307, ¶ 44 (quoting *People v. Evans*, 186 Ill. 2d 83, 93 (1999)). Courts assess counsel's performance based on the "prevailing professional norms" at the time of representation (*People v. Domagala*, 2013 IL 113688, ¶ 36), without the "distorting effects of hindsight" (*Strickland*, 466 U.S. at 689). With respect to the prejudice prong, " '[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.' " *People v. Johnson*, 2021 IL 126291, ¶ 55 (quoting *Strickland*, 466 U.S. at 693). Instead, "[s]atisfying the prejudice prong necessitates a showing of actual prejudice, not simply speculation that defendant may have been prejudiced." *People v. Patterson*, 2014 IL 115102, ¶ 81. A defendant must satisfy both prongs of the *Strickland* test—deficient performance and prejudice—to prevail on an ineffective assistance of counsel claim, and the failure to satisfy either prong invalidates his or her claim. *People v. Veach*, 2017 IL 120649, ¶ 30.

¶ 70     Where, as here, an ineffective assistance of counsel claim is predicated on counsel's conduct during pretrial suppression proceedings, a defendant must show a reasonable probability that had counsel not committed the purported error, the trial court would have granted the motion to suppress, and the result of the trial would have differed if the suppressed evidence had not been introduced. *People v. Givens*, 237 Ill. 2d 311, 331 (2010). The failure to introduce evidence at a suppression hearing can, in certain circumstances, constitute ineffective assistance of counsel. *People v. Patterson*, 192 Ill. 2d 93, 114-15 (2000).

¶ 71     Defendant argues that reasonable defense counsel who chose to investigate defendant's claim that his confession was coerced would have learned of and presented the evidence of Detectives Maslanka's and Fidyk's involvement in coercing confessions in other cases. Regarding

the evidence against Detective Maslanka, defendant attached to his petition (1) the 2006 Report, (2) a transcript excerpt from the May 2009 postconviction petition hearing in People v. Brown, No. 90 CR 23997, (3) a May 2013 TIRC case disposition regarding Anderson's claim of abusive conduct in 1990, which also referenced 14 other incidents of alleged abuse from 1984 to 1991 according to the OPS, and (4) two court opinions, *Clemon*, 259 Ill. App. 3d 5, and *Coleman*, 206 Ill. 2d 261.

¶ 72    Regarding the evidence against Detective Fidyk, defendant attached to his petition a 2018 TIRC case disposition, regarding Abdul Muhammad's claim of abusive conduct in 1999. This 2018 TIRC case disposition also referenced a 2005 OPS complaint by Clinton Dixon that alleged abusive conduct in 2002 and a 2014 IPRA complaint by Lavell Cotton against Detective Fidyk alleging police torture.

¶ 73    The State argues that defense counsel would not have used transcripts or documents produced after defendant's motion to suppress statements hearing in April 2009. Defendant responds, however, that several of the exhibits to his petition refer to other documents that were available before his motion to suppress statements. Defendant adds that defense counsel could have sought reconsideration of the ruling on the motion to suppress statements based on newly discovered evidence at any time prior to the issuance of a final judgment on August 19, 2009.

¶ 74    An attorney must conduct a reasonable investigation of the facts underlying a case; a decision to forgo investigation of a possible claim or defense must be based on an "informed judgment," in that "the facts and circumstances do not reveal a sound basis for further inquiry into a particular area." *People v. Madej*, 177 Ill. 2d 116, 135-36 (1997). Here, defense counsel knew the identity of the police officers that defendant claimed coerced him and could have investigated

them specifically. As found by the trial court, we agree that a reasonable attorney who chose to investigate defendant's claim that his confession was coerced could have obtained nearly all the evidence attached to defendant's petition before the trial court issued a final judgment against him on August 19, 2009, and probably before the filing of his motion to suppress his confession in December 2008.

¶ 75     Specifically, the 2006 Report discussing Detective Maslanka's abuse of Pinex was issued three years before defendant's April 2009 suppression hearing. Furthermore, by May 18, 2009, attorneys for defendant Cortez Brown knew enough to ask Detective Maslanka at the postconviction hearing if he had participated in or seen the mistreatment of eight named suspects, which caused Detective Maslanka to invoke his right against self-incrimination. The May 2013 TIRC case disposition noted that publicly available written complaints against Detective Maslanka existed far earlier, from 1986 to May 22, 2009. And the two court opinions referring to Detective Maslanka were issued about 15 and 7 years, respectively, before defendant's 2009 suppression hearing. Also, the 2018 TIRC case disposition involving Detective Fidyk referenced Dixon's complaint, which was available in 2005 and alleged that Detective Fidyk participated in police torture that occurred in 2002. The only evidence attached to defendant's petition that was not available before judgment was rendered against defendant in August 2009 was Muhammad's allegations against Detective Fidyk, which came to light in the 2018 TIRC case disposition, and Cotton's claims against Detective Fidyk, which came to light in 2014. Accordingly, we will address Muhammad's and Cotton's allegations concerning Detective Fidyk below in the section concerning relaxing the bar of *res judicata* based on fundamental fairness.

¶ 76 The exhibits at issue, however, could not be admitted into evidence without some finding of their relevance. *People v. Anderson*, 2023 IL App (1st) 200462, ¶¶ 177-79.

> "Evidence is relevant if it has any tendency to make the existence of a fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. [Citation.] Probability is tested in the light of logic, experience, and accepted assumption as to human behavior." *Patterson*, 192 Ill. 2d at 115.

"The question of relevancy is a determination to be made by the trial court after a consideration of, *inter alia*, the defendant's allegations of torture and their similarity to the prior allegations." *Id.* at 144-45. "It is within the discretion of the circuit court to decide whether evidence is relevant and admissible, and a reviewing court will not disturb the circuit court's decision absent a clear abuse of that discretion." *Peach v. McGovern*, 2019 IL 123156, ¶ 25. An abuse of discretion occurs "where no reasonable person would take the position adopted by the circuit court." *Id.*

¶ 77 Although complaints of other acts of physical abuse and coercion against an accused officer are allegations and not judicial findings, and are not admissible to prove a propensity to commit those acts, they are nevertheless admissible for any other relevant purpose. See *Patterson*, 192 Ill. 2d at 114-15; *People v. Cannon*, 293 Ill. App. 3d 634, 640 (1997).

> "Here, evidence of other acts of brutality to obtain confessions could serve two purposes: First, it might prove intent, plan, motive, and a course of conduct of the officers—all relevant to [a defendant's] claim he was tortured. [Citation.] Second, evidence of other similar acts could be used to impeach the credibility of the Area 2 police officers who will testify at the hearing." *Id.*

¶ 78    When a defendant alleges that a statement was the product of physical coercion, counsel may be found to be ineffective for failing to introduce admissible evidence to support the defendant's claim of abuse at a suppression hearing. *Patterson*, 192 Ill. 2d at 114-15. Evidence of prior police brutality has been found to be relevant and admissible where the prior incidents involved the same officer and similar methods of torture, which occurred at or near the time of the defendant's alleged abuse. *Id.* at 115; *Wilson v. City of Chicago*, 6 F.3d 1233, 1238 (7th Cir. 1993); see *Cannon*, 293 Ill. App. 3d at 640 (evidence of prior brutality admissible where the defendant could present evidence that "the police officers who questioned him systematically tortured other suspects to obtain confessions at or near the time he was questioned"); *People v. Banks*, 192 Ill. App. 3d 986, 994 (1989) (prior brutality evidence admissible when the allegations were similar and involved the same officers, the incidents occurred only 13 months apart, and both the prior allegations and the allegations in the case before the court contained evidence of injury consistent with police brutality).

¶ 79    In contrast, prior dissimilar and stale allegations of abuse are irrelevant and inadmissible. The Illinois Supreme Court "has declined to find evidence of prior police brutality to be relevant when the defendant offered only generalized allegations of coercive activity at Area 2 (*People v. Orange*, 168 Ill. 2d 138, 150-51 (1995)) and when the allegations of brutality were not similar and occurred three years before the case at bar [(*People v. Hobley*, 159 Ill. 2d 272, 312 (1994))]." *Patterson*, 192 Ill. 2d at 115. In *Patterson*, the court concluded that the evidence of other allegations of torture was not relevant because the other defendant in the prior case "was mistreated for a reason wholly unrelated to defendant's case [*i.e.*, because Area 2 officers, rather than routinely torturing all suspects, routinely tortured those accused of killing police officers,] and

because the evidence identified only a single incident of misconduct removed in time [*i.e.*, by about four years] from defendant's" incident). *Id.* at 119.

¶ 80 "Evidence will generally provide stronger corroboration for defendant's allegations if it documents abuse close in time to his own. A single incident, years removed, will not establish a pattern and practice of police abuse, *but ' "a series of incidents spanning several years" ' might.*" (Emphasis added.) *People v. Brandon*, 2021 IL App (1st) 172411, ¶ 74 (quoting *People v. Jackson*, 2021 IL 124818, ¶ 37, quoting *Patterson*, 192 Ill. 2d at 140). The similarity of the methods of abuse in the defendant's allegations and the other instances of torture

"is a critical factor to consider when determining whether new evidence of police misconduct in other cases establishes a pattern and practice of certain behavior. However, the test is not one of exact or perfect identity. Rather, the critical inquiry is simply whether there is sufficient similarity between the misconduct at issue in the present case and the misconduct shown in other cases, *such that it may fairly be said the officers were acting in conformity with a pattern and practice of behavior.* This determination will necessarily depend on the unique facts of each case." (Emphasis added.) *Jackson*, 2021 IL 124818, ¶ 34.

¶ 81 The proffered evidence must charge the officer before the court with some breach of duty related to the defendant's case to establish that officers were acting in conformity with a pattern and practice of behavior. *Id.* ¶¶ 37-38. Moreover, there is no general blanket requirement that a prior civil suit or administrative complaint include an express finding of wrongdoing by the officers at issue in the proffered evidence presently before the court. *Anderson*, 2023 IL App (1st)

200462, ¶¶ 189-92 (citing *Jackson*, 2021 IL 124818, ¶ 34, citing *Patterson*, 192 Ill. 2d at 144-45). The pertinent inquiry is whether the evidence presents conduct that is "sufficiently similar" to defendant's alleged abuse, but the similarity of past allegations of police misconduct does not depend on whether the officer was ever disciplined. *Id.*

¶ 82    Defendant argues that there is sufficient similarity between defendant's allegations against Detectives Maslanka and Fidyk in this case and the allegations against those detectives in other cases to establish that defendant's allegations, if true, are part of a pattern or practice of behavior on the part of the detectives.

¶ 83                    1. Evidence Pertaining to Detective Maslanka

¶ 84                        a. 2006 Report

¶ 85    Defendant first cites an excerpt from the 2006 Report tasked with examining allegations of abuse that occurred at Area 2 under the tenure of disgraced Chicago Police Commander Jon Burge. The 2006 Report investigated allegations of abuse made by Pinex against Detective Maslanka and another officer. Pinex alleged that Detective Maslanka questioned him in violation of his *Miranda* rights and beat him until he admitted to his involvement in a gang-related shooting. Specifically, Pinex alleged that when Detective Maslanka started to question him, Detective Maslanka said that he wanted "no bulls***." Egan & Boyle, *supra* at 278. When Pinex said that he wanted his lawyer present before he said anything, Detective Maslanka told him that he did not have a lawyer and was tired of Pinex lying to him. After Pinex initially denied being involved in the shooting, Detective Maslanka struck his right eye, kneed his left eye, struck the right portion of his head, and grabbed his hair while another officer struck his ribs and grabbed his leg so that Pinex, who was trying to cover and protect his face, could not move. The beating caused Pinex to defecate in

his pants. The events were alleged to have taken place in June 1985. The 2006 Report concluded that there was "sufficient evidence to present to a grand jury and seek the indictment of Maslanka *** for aggravated battery, perjury and obstruction of justice." Egan & Boyle, *supra* at 290.

¶ 86    The trial court ruled that the evidence in the 2006 Report was irrelevant and inadmissible. Specifically, the court found that it was remote because it was 24 years old at the time of defendant's trial. The court also found that the evidence was factually dissimilar to defendant's case because defendant testified that Detective Maslanka "merely slapped him in the face a few times with an open hand" while asking him about Emmanuel's whereabouts. We disagree.

¶ 87    The 1985 misconduct described in the 2006 Report occurred approximately 18 years before defendant's alleged abuse in 2003. The 2006 Report shows abuse sufficiently similar to defendant's own, in which Detective Maslanka threatened defendant with violence unless he cooperated, interrogated him in violation of his *Miranda* rights, and struck him. The 2006 Report and the additional relevant evidence discussed below, taken together, would satisfy the pattern and practice of abuse standard. See *Brandon*, 2021 IL App (1st) 172411, ¶ 75 ("overall this evidence reveals a series of incidents, spread out over years, that suggests a long-standing practice of abuse and coercion similar to that alleged by defendant").

¶ 88    The State argues that the trial court properly found that the 2006 Report was irrelevant because the physical abuse described in the 2006 Report is not sufficiently similar to defendant's claims of abuse in this case. To support this proposition, the State cites *People v. Vidaurri*, 2023 IL App (1st) 200857, ¶ 51, where the court found that an individual's allegation that a detective punched him in the ribs and stomach was too dissimilar from the defendant's claims that he was slapped to support a finding of pattern and practice. *Vidaurri* is currently pending review before

the Illinois Supreme Court, and we disagree with this finding in *Vidaurri* as inconsistent with *Jackson*, 2021 IL 124818, ¶ 34, which held that the "test [regarding sufficient similarity] is not one of exact or perfect identity."

¶ 89   Whereas Pinex alleged that Detective Maslanka struck him in his eye, kneed him in the face, and pulled his hair as another officer beat his ribs, defendant alleged that Detective Maslanka "smacked" his face. Differences in either the manner in which an officer struck the defendant or where on the defendant's body the blows landed does not lessen the relevance of the abuse described in the 2006 Report. Making qualitative distinctions based on what part of the body witnesses or suspects were struck and with what object would "trivialize established principles for decent law enforcement." *Cannon*, 293 Ill. App. 3d at 640. Here, what is critical is that the complaints of abuse all involve "coercion or intimidation of a witness or suspect." *Jackson*, 2021 IL 124818, ¶¶ 34-35. We conclude that the trial court abused its discretion when it found that the 1985 misconduct described in the 2006 Report was irrelevant and inadmissible. The 2006 Report is relevant to show, in combination with the other relevant and admissible evidence discussed below, a pattern and practice of abuse by Detective Maslanka.

¶ 90                              b. Transcript Excerpt

¶ 91   Defendant also submitted with his petition an excerpt from a hearing transcript from May 18, 2009, (shortly before defendant's trial began) where Detective Maslanka was called as a witness in postconviction proceedings in People v. Brown, No. 90-CR-23997, in the circuit court of Cook County. In response to questions concerning whether Detective Maslanka worked under the command of Burge at Area 2, whether Detective Maslanka was involved in a series of cases where suspects under his supervision and interrogation were abused and tortured, and whether he

had participated in or witnessed the mistreatment of Pinex, Donald Torrence, Eric Johnson, Anderson, Roosevelt Taylor, Steve Zahora, or Jesse and Damoni Clemon, Detective Maslanka invoked his fifth amendment right against self-incrimination. Although Detective Maslanka was asked questions about his involvement with these suspects, neither the nature of the allegations of abuse nor the timing of the alleged abuse is specified in the transcript excerpt.

¶ 92    Here, although the trial court acknowledged that it could make a negative inference from this evidence, the court did not give it any significant weight, noting that the right of any citizen to invoke the fifth amendment privilege is not an admission of guilt. Also, the trial court reviewed *People v. Brown*, 169 Ill. 2d 132, 147 (1996), and noted that a paramedic's report indicated that upon Brown's arrival at the Cook County jail, he had no health complaints and bore no signs of physical injury, which did not support his allegations that he was beaten with a flashlight and threatened with the death penalty. Further, the trial court noted that the Illinois Supreme Court rejected Brown's contention that the length and circumstances of his detention by the police demonstrated that his statements were the result of an overborn will. *Id.* at 149. In addition, the trial court, citing *People v. Anderson*, 402 Ill. App. 3d 1017, 1034 (2010), noted that the 2006 Report concluded that Brown was not credible as a victim.

¶ 93    The State also argues that the transcript lacks any specificity when it comes to the nature and timing of the abuse that is obliquely referenced; "[i]t is simply unclear what type of abuse these individuals purportedly sustained and when the abuse purportedly occurred. Given these omissions, it is unlikely the exhibit would have been found to be relevant and admissible." In support of this proposition, the State cites *People v. Orange*, 168 Ill. 2d 138, 151 (1995), and *People v. Hobley*, 159 Ill. 2d 272, 311-12 (1994), which noted that prior allegations of police

torture may be admissible only with sufficient indicia of timeliness and similarity. The State also cites *Vidaurri*, 2023 IL App (1st) 200857, ¶ 45, which found that prior allegations of abuse that lacked sufficient details did not support the defendant's claim that the detective had a pattern and practice of abusive behavior.

¶ 94 It is well settled that a court may, but is not required to, draw a negative inference from an officer's invocation of his fifth amendment right. *People v. Whirl*, 2015 IL App (1st) 111483, ¶ 107; *People v. Rodriguez*, 2021 IL App (1st) 200173, ¶ 53. The points raised by the trial court regarding *Brown* and *Anderson* raise credibility issues that are not appropriate for the court to consider at the second stage of postconviction proceedings. See *Johnson*, 2017 IL 120310, ¶ 14 (the trial court does not make credibility determinations at the second stage of postconviction proceedings). Moreover, defendant Brown's credibility is not at issue in defendant's petition. Rather, the excerpt supports defendant's argument that Detective Maslanka's invocation of his fifth amendment right should draw a negative inference as it pertains to Pinex, Torrence, Anderson, and Jesse and Damoni Clemon because they are discussed in the other exhibits attached to defendant's petition. We conclude that, in this context, the transcript excerpt is relevant and admissible, and the trial court abused its discretion in holding otherwise.

¶ 95 c. May 2013 TIRC Case Disposition

¶ 96 Defendant's next exhibit to his petition is a TIRC case disposition that investigated allegations of abuse made by Anderson against Detective Maslanka and another detective (Anderson TIRC Report). Before addressing this exhibit, we note the standard that TIRC uses to issue its findings:

"[TIRC] is not tasked by the General Assembly to conduct full, adversarial, evidentiary hearings concerning the likelihood of torture, or even to make a final finding of fact that torture likely occurred. That remains the role of the courts. Instead, [TIRC] has interpreted [section 45(c) of the Illinois Torture Inquiry and Relief Commission Act (775 ILCS 40/45(c) (West 2018))], through its administrative rules, as not requiring that it be more likely than not that any particular fact occurred, but rather that there is sufficient evidence of torture to merit judicial review." *In re Claim of Muhammad*, Ill. Torture Inquiry & Relief Comm'n Cl. No. 2014.256-M, at 17 (2018).

In *People v. Christian*, 2016 IL App (1st) 140030, ¶ 98, the court compared TIRC to a court deciding whether a postconviction petition can advance to the third stage.

¶ 97      According to the Anderson TIRC Report, Anderson alleged that during questioning in April 1990, while another detective held a gun to Anderson's head and threatened to blow his brains out, Detective Maslanka "jabbed [Anderson] with a nightstick in his thighs and back" until he was crying and agreed to confess to several offenses. *In re Claim of Anderson*, Ill. Torture Inquiry & Relief Comm'n Cl. No. 2011.014-A, at 1 (2013). TIRC deemed Anderson's torture allegations "credible" and found that they were supported by a preponderance of the evidence. *Id.* at 3.

¶ 98      The Anderson TIRC Report also included as an exhibit an OPS memoranda or chart identifying 14 other complaints of abuse of which TIRC was aware. Those other complaints

alleged incidents of abuse involving Detective Maslanka that occurred between 1984 and 1991.[1] Those allegations of abuse included (1) in 1984, choking and twisting the arm of Terry Harris, holding him in his underwear overnight, repeatedly threatening him, and making sexually derogatory comments; (2) in 1985, severely beating Pinex; (3) in 1988, beating Torrence; (4) in 1990, striking Eric Johnson in his face, knocking him to the ground, and kicking him in his stomach, chest, and face; (5) in 1990, slapping David Weston, beating him, and psychologically coercing him; (6) in 1990, beating Brown, including with a flashlight on his arms and chest; (7) in 1991, shocking 13-year-old Marcus Wiggins, beating him, and denying him access to his mother; (8) in 1991, hitting Jesse Clemon with a flashlight, and beating him on his chest and body; (9) in 1991, physically beating Iamari Clemon; (10) in 1991, shocking Demoni Clemon and threatening him with a pistol; (11) in 1991, beating 16-year-old Clinton Welton with a flashlight and fists; (12) in 1991, beating 16-year-old Diyez Owen on his chest and stomach; (13) in 1991, slamming Travis Richardson's head on a table; and (14) in 1991, striking Tremaine Green in his eye and on his back and chest. The sources of the 14 other complaints included the 1986 statement and other rulings of the OPS, the 2006 Report, a civil complaint, rulings, orders and opinions in criminal cases, court testimony, and an affidavit.

¶ 99    The trial court found that Anderson's allegations of abuse were remote because they were almost two decades old at the time of defendant's trial. Also, the court found no factual similarity between defendant's claims and those of Anderson. Regarding the OPS chart exhibit, the court cited *Anderson*, 402 Ill. App. 3d at 1034-35, which affirmed the dismissal of Anderson's

---

[1]According to defendant's petition, 1991 was the final year for which TIRC was conducting investigations according to its statutory mandate at the time.

successive postconviction petition and noted that, of the 15 total abuse complaints made against Detective Maslanka, the 2006 Report "at best *** identifies one single instance of misconduct by Detectives Maslanka *** with regard to Alfonzo Pinex."

¶ 100    The State argues that the Anderson TIRC Report describes abuse that occurred more than a decade prior to defendant's alleged abuse. Specifically, Anderson's abuse allegedly occurred in 1990, whereas defendant alleges he was abused in 2003. The State also contends that the abuse in the Anderson TIRC Report differs qualitatively from the abuse defendant describes because Anderson alleged that he was jabbed with a nightstick while defendant never described being struck with any kind of weapon or instrument. According to the State, the stale, dissimilar allegations of abuse described in the Anderson TIRC Report thus have little relevancy here.

¶ 101    The State also argues that the chart included in the Anderson TIRC Report referencing 14 other claims of abuse that allegedly occurred from 1984 to 1991 does not support defendant's claims of relevance and admissibility because the most recent allegation of abuse occurred 13 years before defendant interacted with Detective Maslanka and the chart fails to provide any details about the circumstances of the abuse aside from general descriptions.

¶ 102    We conclude that although the Anderson TIRC Report is too remote standing alone, when considered with the rest of defendant's admissible evidence, the Anderson TIRC Report is relevant to show a pattern and practice of abuse. See *Brandon*, 2021 IL App (1st) 172411, ¶ 75. Moreover, the standard for sufficient similarity under *Jackson*, 2021 IL 124818, ¶ 34, does not require exact or perfect identity regarding the alleged abuse, and Anderson's allegations of being jabbed in his back and thighs with a nightstick are sufficiently similar to defendant's allegations of being struck in the face with Detective Maslanka's hand. The OPS chart exhibit is also relevant to the extent of

its references to the allegations of physical abuse made by Pinex, Torrence, Brown, and Jesse, Iamari, and Demoni Clemon, which are contained in the other documents submitted with defendant's petition. The trial court abused its discretion in ruling otherwise.

¶ 103                          d. Court Opinions

¶ 104   Finally, defendant also submitted as exhibits to his petition two opinions discussing allegations of abuse involving Detective Maslanka.

¶ 105                          (i) *People v. Clemon*

¶ 106   In the first opinion, *Clemon*, 259 Ill. App. 3d 5, the defendant, Jesse Clemon, sought to suppress his pretrial statement as the product of both physical coercion and a coercive atmosphere. Evidence at the suppression hearing revealed that Detective Maslanka was one of several detectives who interviewed Jesse in September 1991. According to the opinion, the State's evidence showed that Detective Maslanka interrogated Jesse at 2:15 a.m. for 15 to 20 minutes, approximately four hours before Jesse first provided an inculpatory statement to an ASA and another detective at 6:15 a.m. Also, Detective Maslanka denied that Jesse was abused while in custody. *Id.* at 6.

¶ 107   Although the opinion did not specify Jesse's allegations of abuse against Detective Maslanka and the other named officers individually, the opinion summarized Jesse's allegations against the officers generally. Those allegations included witnesses testifying that four or five officers hit Jesse with their fists and a flashlight as they led him from his apartment; officers brought Jesse and 10 other suspects to the third floor of Area 3 and held them in separate locations but nearby each other; shadows through the window of Jesse's room showed officers hitting him, and Jesse falling to the floor, hollering, and saying, "I didn't do it"; officers hit Jesse's brother,

Iamari Clemon, with their fists for 30 to 40 minutes; at various times, officers brought other suspects into Jesse's room for a few minutes and Jesse screamed periodically for about 15 minutes when three or four officers were in his room with the door closed; Jesse emerged from his room with his hand bandaged, limped, held his stomach, and said, "I'm sick"; officers went into Damoni Clemon's room for 15 minutes with a black object smaller than a flashlight, during which time Damoni was heard screaming; and that when Damoni came out, he told another suspect that he had been electrically shocked. *Id.* at 6-8. The appellate court affirmed the trial court's order, which had granted Jesse's motion to suppress his statement based " 'solely on the oppressive atmosphere that existed' " at Area 3 at the time of his statement. *Id.* at 9.

¶ 108   Here, the trial court found that *Clemon* discussed no specific allegations of abuse against Detective Maslanka of any kind and, at most, indicated that Detective Maslanka was merely present during some of the initial questioning of Jesse. The court concluded that *Clemon* offered no evidentiary value to support defendant's claims of a pattern or practice of abuse by Detective Maslanka because the trial court in *Clemon* did not base its suppression ruling on witness credibility about someone being struck, but rather based the suppression ruling solely on the oppressive atmosphere that existed in that headquarters on that evening with 11 people in custody being questioned about a crime.

¶ 109   The State argues that, given that *Clemon* did not specify which allegations of abuse applied to Detective Maslanka, the decision lacks evidentiary value to support defendant's claim that Detective Maslanka had a pattern and practice of abusing suspects in custody.

¶ 110   We conclude that the allegations of abuse in *Clemon* are relevant to show a pattern and practice of abuse involving Detective Maslanka because he testified that Jesse was not abused

- 40 -

while in custody, indicating that Detective Maslanka was present during the course of the alleged abuse. There is no reason to believe that an officer willing to cooperate in the coercion of a statement would have scruples against doing so alone. Courts have consequently held that relevant allegations in other cases can involve "committing acts of physical abuse *or failing to stop such abuse*." (Emphasis added.) *People v. Orange*, 195 Ill. 2d 437, 455 (2001) (citing, *inter alia*, *People v. King*, 192 Ill. 2d 189, 198 (2000)); see *Whirl*, 2015 IL App (1st) 111483, ¶ 103 ("even if the new evidence established only that [the accused officer in the present case] stood by and did nothing while other officers committed acts of torture and abuse, silent acceptance is still relevant to the issue of whether [that officer's] credibility may have been impeached as a result of this evidence"). Accordingly, the *Clemon* court's finding that an oppressive atmosphere existed at the headquarters where Detective Maslanka worked is also relevant pattern and practice evidence. We find that the trial court abused its discretion in ruling otherwise.

¶ 111                                     (ii) *People v. Coleman*

¶ 112    The second opinion is *Coleman*, 206 Ill. 2d 261, wherein Coleman alleged that Detective Maslanka only conducted a suggestive lineup. Defendant Coleman argued the circuit court at his stage-three postconviction hearing abused its discretion by not reopening the cross-examination of Detective Maslanka to allow postconviction counsel to question him about allegations of misconduct in other cases. Coleman claimed that the evidence of the alleged misconduct was admissible to show that Detective Maslanka's *modus operandi* was to use whatever means were necessary to convict his victims, including torture, suggestive lineups, false police reports, and perjury. Coleman's evidence of other allegations of misconduct against Detective Maslanka included that he tortured suspects in custody in six cases, at least two settlements had been obtained

against him and/or the City of Chicago, he had been investigated by OPS, and the Chicago Police Department had suspended him for misconduct. *Id.* at 272-73. The court found no abuse of discretion because Coleman did not allege that Detective Maslanka physically abused him in any manner, so the civil suits alleging physical abuse against Detective Maslanka were not relevant to his credibility. *Id.* at 282-83.

¶ 113 Defendant cites an excerpt from *Coleman* wherein the court referenced two settled civil suits wherein the individuals completed affidavits that included allegations of abuse against Detective Maslanka. One affiant was Torrence, who sued Detective Maslanka and/or the City of Chicago, alleging physical abuse and failure to follow established procedures. Torrence obtained a $2100 settlement. Torrence attested that in 1988 Detective Maslanka and another officer accosted him at his home and that Detective Maslanka struck him on the head with a gun while Torrence was in handcuffs. The other affiant, Tyrone Burnett, attested that he was arrested in 1996 and Detective Maslanka deliberately drove his police car into Burnett, causing serious injuries. Burnett filed a lawsuit that was later settled.

¶ 114 Here, the trial court found that *Coleman* contained no allegations of physical abuse whatsoever by Detective Maslanka, whose only duty was to conduct the lineup. Moreover, the trial court ruled that the mere discussion by the reviewing court in *Coleman* of prior allegations in other cases, such as Torrence's and Burnett's civil lawsuits, did not amount to relevant evidence.

¶ 115 The State argues that Torrence's and Burnett's allegations referenced incidents that occurred in 1988 and 1996, many years before 2003, when defendant alleged Detective Maslanka abused him. The State also argues that Torrence's and Burnett's allegations of abuse against Detective Maslanka involved significantly different types of abuse than defendant alleged here

- 42 -

because striking an individual with a gun or a car is categorically different from slapping someone with an open hand. See *People v. Anderson*, 375 Ill. App. 3d 121, 137-38 (2007) (prior evidence of torture involving electric shock was too dissimilar to the petitioner's allegations that officers struck him with a billy club to be admissible). Furthermore, the State argues that although the lawsuits were apparently settled, absent a specific finding of wrongdoing, civil suits alleging police misconduct are not necessarily relevant or admissible to establish a pattern and practice of misconduct. According to the State, Torrence's and Burnett's stale, dissimilar allegations of abuse thus have no probative value in establishing a pattern and practice of abuse to substantiate defendant's claim.

¶ 116 Defendant responds that the absence of specific findings of wrongdoing does not render civil suits like Torrence's and Burnett's inadmissible, and neither the trial court nor the State cited any law to support the proposition that findings in other cases are determinative. Defendant contends that the point of considering testimony about other cases under Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011) is that testimony of wrongdoing by police officers is more credible when considered along with other such testimony. See *Jackson*, 2021 IL 124818, ¶ 34; *Patterson*, 192 Ill. 2d at 115-16. Moreover, to admit evidence that a person performed a crime or other bad act under Rule 404(b), a party need not offer proof beyond a reasonable doubt so long as there is more than a mere suspicion of guilt. *People v. Thingvold*, 145 Ill. 2d 441, 456 (1991); accord *People v. Valdez*, 2022 IL App (1st) 181463, ¶ 59; Ill. R. Evid. 404(b) (eff. Jan. 1, 2011).

¶ 117 "[M]ere evidence of a civil suit against an officer charging some breach of duty unrelated to the defendant's case does not raise an inference of bias or motive to testify falsely and is not admissible to impeach the officer." (Internal quotation marks omitted.) *Jackson*, 2021 IL 124818,

¶ 38. However, the *Jackson* court did not require a specific finding of wrongdoing. See *id.* ¶¶ 36-38. Rather, the *Jackson* court required that civil suits provide enough information to determine whether the officers named in the lawsuit were alleged to have engaged in the type of behavior alleged in the torture allegation. *Id.* ¶ 36 (because there was no way to determine from a civil complaint if either of two named detectives engaged in any witness intimidation or coercion, the complaint had no probative value in establishing a pattern and practice of misconduct relevant to the case).

¶ 118 Furthermore, the remoteness of Torrence's and Burnett's allegations of misconduct does not render this evidence inadmissible for purposes of pattern and practice evidence. We find, however, that Burnett's allegation that Detective Maslanka struck him with a vehicle during his arrest is too dissimilar from defendant's allegation of being struck in the face with an open hand during his interrogation to be relevant and admissible evidence. Nevertheless, we find that the trial court abused its discretion when it found that Torrence's allegations of abuse were irrelevant and inadmissible.

¶ 119 In addition, the State argues that Detective Maslanka was never called to testify during any of the pretrial hearings or at trial and, thus, none of the exhibits on which defendant relies could have been used to impeach him. Defendant responds that he has never claimed that the Detective Maslanka evidence was admissible as impeachment material. Rather, defendant has claimed that the evidence was substantially admissible under Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011) to corroborate his own testimony by showing Detective Maslanka's intent, plan, and motive in interrogations. See *Cannon*, 293 Ill. App. 3d at 640; Ill. Rs. Evid. 403, 404(b) (eff. Jan. 1, 2011). As such, it is admissible.

¶ 120 The State also argues that the relevancy of any pattern and practice evidence against Detective Maslanka is lessened because during pretrial proceedings, defendant gave inconsistent descriptions of the abuse he purportedly suffered at Detective Maslanka's hands. At the 2007 hearing on defendant's motion to quash his arrest and suppress evidence, he testified that when the authorities forcibly entered his residence, an unnamed officer smacked his face with an open hand and threatened to "bust [his] s***" if he was untruthful. Defendant further testified that he talked to the same officer after he was transported to Area 2, and that the officer never touched him again. However, at the 2009 hearing on defendant's motion to suppress his statement, his claims evolved. This time, he named Detective Maslanka as the officer who smacked his face at his house and testified that Detective Maslanka continued his abuse at Area 2 where he "put his hands on" defendant and "smacked [him] a few more times."

¶ 121 Furthermore, the State argues that the record rebuts defendant's claim that Detective Maslanka was the officer who smacked his face after officers forcibly entered the residence on February 6, 2003. See generally *Johnson*, 2017 IL 120310, ¶ 14 (during second-stage proceedings, a court need not accept as true allegations that are positively rebutted by the record). At the suppression hearing, defendant testified that the officer who smacked his face at his residence (*i.e.*, Detective Maslanka) was the same one who continued to smack him at Area 2. Notably, however, Sergeant Brannigan, one of the officers who forcibly entered the residence, expressly denied that Detective Maslanka was present, and Detective Lombard testified that he was the officer who remained with defendant by the couch while other officers searched the residence.

¶ 122 We acknowledge the inconsistencies in defendant's pretrial testimony and the State's rebuttal evidence regarding Detective Maslanka not being present at defendant's residence. This

evidence, however, does not positively rebut defendant's allegations of abuse, and credibility determinations are not proper during second-stage postconviction proceedings. See *id.*

¶ 123   Although the allegations against Detective Maslanka, with the final instance occurring in 1991, are remote in time from defendant's allegations occurring in 2003, the allegations of prior similar misconduct are numerous. While a "single incident, years removed, will not establish a pattern and practice of police abuse," a "series of incidents spanning several years" can. (Internal quotation marks omitted.) *Brandon*, 2021 IL App (1st) 172411, ¶ 74. In *Brandon*, where the defendant alleged coercion in 1991, claims of abuse in 1992, 1999, and 2001 involving the same detectives sufficiently suggested "a long-standing practice of abuse and coercion" to merit filing a successive postconviction petition. *Id.* ¶ 75. That witnesses testified that Detective Maslanka consistently coerced confessions for at least 7 years about 10 years before defendant's interrogation is relevant and admissible to corroborate defendant's allegations of abuse against Detective Maslanka.

¶ 124                     2. Evidence Pertaining to Detective Fidyk

¶ 125   Regarding defendant's evidence as to Detective Fidyk, the petition included a 2018 TIRC case disposition that investigated claims of abuse made by Abdul Muhammad (Muhammad TIRC Report). This TIRC report also discussed two complaints against Detective Fidyk by Dixon and Cotton. As discussed above, we will not analyze Muhammad's and Cotton's allegations of abuse under the rubric of ineffective assistance of counsel because Muhammad's and Cotton's claims were not available until 2018 and 2014, respectively, and thus were not reasonably discoverable by the time of defendant's suppression hearing and trial in 2009. We address Muhammad's and

Cotton's allegations in the next section concerning fundamental fairness and *res judicata*, wherein we conclude that these allegations are admissible as new evidence.

¶ 126 The Muhammad TIRC Report noted that Detective Fidyk was named in 10 complaints, 2 of which alleged that he participated in torture to secure a confession. In the first complaint, Dixon alleged that on September 22, 2002, Detective Fidyk and two other officers drove Dixon to a vacant lot. Detective Fidyk was present while another officer physically abused Dixon, put a gun to his head, and threatened to kill him if he did not confess to a murder. Dixon further alleged that Detective Fidyk rewarded him with heroin after he confessed. TIRC noted that Dixon's complaint was not sustained and his motion to suppress his confession in his criminal case was denied. *In re Claim of Muhammad*, Ill. Torture Inquiry & Relief Comm'n Cl. No. 2014.256-M (2018). Dixon's allegations against Detective Fidyk were within five months of defendant's interrogation in February 2003.

¶ 127 The trial court stated that Dixon's claims were not sustained after it was determined through medical records that injuries he claimed the police had inflicted upon him existed two weeks before he came in contact with them. The trial court found that this evidence did not rise to the level of material evidence to show a pattern of abuse and concluded that defendant failed to meet his burden under either prong of *Strickland* as applied to Detective Fidyk.

¶ 128 The State also argues that Dixon's complaint was not sustained, no finding of wrongdoing was made against Detective Fidyk, and Dixon's abuse allegations differ dramatically from those voiced by defendant, who never alleged that Detective Fidyk transported him to a private location and beat him, thus lessening the relevancy of Dixon's complaint.

¶ 129   To the extent the trial court found no factual similarity in Dixon's allegations against Detective Fidyk based on Detective Fidyk merely being present when another officer put a gun to Dixon's head and threatened to kill him if he did not confess, the allegations show that Detective Fidyk was willing to cooperate in the coercion of a statement. Courts have held that relevant allegations in other cases can involve "committing acts of physical abuse *or failing to stop such abuse*." (Emphasis added.) *Orange*, 195 Ill. 2d at 455 (citing, *inter alia*, *King*, 192 Ill. 2d at 198). Dixon's claim is not rendered irrelevant based on Detective Fidyk's mere presence at the scene. See *Whirl*, 2015 IL App (1st) 111483, ¶ 103 ("even if the new evidence established only that [the accused officer in the present case] stood by and did nothing while other officers committed acts of torture and abuse, silent acceptance is still relevant to the issue of whether [that officer's] credibility may have been impeached as a result of this evidence").

¶ 130   Moreover, Dixon's allegation that he was threatened with a gun to confess is not so dissimilar from defendant's allegation that Detective Fidyk revealed his gun in his ankle holster and insinuated that he could shoot defendant in the interrogation room. In addition, Dixon's medical records, which showed that his injuries existed two weeks before he came in contact with the police, do not lessen the relevance of Dixon's complaint because the absence of physical injury, standing alone, does not preclude evidence of prior bad acts of brutality from being admissible. *Patterson*, 192 Ill. 2d at 116 (citing *Cannon*, 293 Ill. App. 3d at 642). Accordingly, we find that the trial court abused its discretion when it ruled that this evidence was not relevant.

¶ 131   The State also argues that defendant's allegations of abuse against Detective Fidyk lack consistency. During the hearing on his motion to quash his arrest and suppress evidence, defendant never alleged he suffered any abuse at the hands of Detective Fidyk. When he later testified at his

suppression hearing, however, defendant testified that Detective Fidyk treated him worse than Detective Maslanka had, and described a variety of abusive behavior. Defendant claimed that Detective Fidyk choked, slapped, and kicked him, insinuated he could shoot him, and forced him to reenact crime scene pictures. The State contends that the evolution and lack of consistency of defendant's claims of abuse against Detective Fidyk lessens the relevance of prior allegations of abuse involving the detective. See *People v. Blalock*, 2022 IL 126682, ¶ 49 (leave to file a successive postconviction petition denied because the defendant's allegations of police coercion were directly contradicted by this sworn trial testimony, which explicitly stated that no one threatened him to make his statement).

¶ 132   Defendant responds that his allegations of abuse concerning Detective Fidyk were not relevant to the only issue litigated at defendant's motion to quash his arrest, *i.e.*, whether the officers lacked probable cause to arrest him. Defendant states that he first testified about Detective Fidyk's abuse at the hearing on the motion to suppress statements because that was the first time Detective Fidyk's abuse was relevant.

¶ 133   Dixon's alleged abuse occurred within five months of defendant's alleged abuse in 2003. Cotton's allegations against Detective Fidyk apparently occurred in 2002. Although Muhammad's allegations against Detective Fidyk, which occurred in 1999, are remote in time from defendant's allegations, a "series of incidents spanning several years" can establish a pattern and practice of police abuse. (Internal quotation marks omitted.) *Brandon*, 2021 IL App (1st) 172411, ¶ 74.

¶ 134   Based on the available, relevant, and admissible evidence of Detectives Maslanka's and Fidyk's pattern and practice of abuse, we conclude that defendant made a substantial showing that

trial counsel's performance was objectively unreasonable when counsel failed to present this evidence to corroborate defendant's allegations of abuse.

¶ 135    Regarding the prejudice prong of *Strickland*, the trial court ruled that *all* the evidence defendant offered against Detectives Maslanka and Fidyk, on its face, was legally insufficient and did not rise to a level of material and relevant evidence that would have been admissible by the trial court at defendant's motion to suppress his statements. Accordingly, the trial court concluded that because defendant showed no pattern of abuse or torture, he failed to satisfy either prong under *Strickland* to show ineffective assistance of trial counsel regarding Detectives Maslanka and Fidyk.

¶ 136    We disagree. Defendant made a substantial showing that there is a reasonable probability that the result of the suppression hearing would have been different because the admissible evidence attached to his petition tends to show that Detectives Maslanka and Fidyk were acting in conformity with a pattern and practice when they allegedly coerced defendant's cooperation or confession. The evidence could have affected the judge's credibility assessment of defendant's testimony regarding the alleged physical abuse he suffered at the hands of Detectives Maslanka and Fidyk. Furthermore, the evidence could have simultaneously raised doubts as to the veracity of the law enforcement personnel whose previous testimony the State incorporated into the suppression hearing. It is also likely that if Detective Maslanka had been called as a witness at the suppression hearing, he would have invoked his fifth amendment right against self-incrimination, just as he did only one month later at the postconviction evidentiary hearing in *Brown*. Although the invocation of the fifth amendment is not an admission of guilt, a negative inference can be drawn from that fact. *Whirl*, 2015 IL App (1st) 111483, ¶ 107. The admissible evidence provides corroboration for defendant's claim of abuse, which is taken as true at this stage of the proceedings.

If defendant's claim is found to be credible at a hearing, defendant's confession would likely be suppressed as the product of physical coercion.

¶ 137   Furthermore, defendant would have been acquitted if his statements to the police had been suppressed. A physically coerced confession is never harmless error. *People v. Wrice*, 2012 IL 111860, ¶¶ 71-73. But more basically, absent defendant's confessions, there would not have been sufficient evidence to convict him of the Perry murders. Although it was clear that Emmanuel had committed the Perry murders and very likely with at least one other person, no forensic or other evidence suggested defendant was that other person, besides defendant's statements. Additional evidence showed that defendant and Emmanuel were friends and had contact with each other but nothing indicated that defendant was Emmanuel's only friend or that no one else could possibly have been Emmanuel's accomplice.

¶ 138   Whether defendant's allegations and supporting evidence will ultimately be found credible remains to be seen. We express no view on that question. The State's motion to dismiss defendant's petition should have been denied.

¶ 139   We conclude that defendant has made a substantial showing that trial counsel's performance was ineffective by failing to support defendant's motion to suppress statements with evidence that demonstrated Detectives Maslanka's and Fidyk's pattern and practice of coercing confessions from suspects. Accordingly, we reverse the trial court's judgment regarding the pattern and practice evidence against Detectives Maslanka and Fidyk and remand the matter for third-stage postconviction proceedings.

¶ 140                              B. Fundamental Fairness

¶ 141   In the alternative, defendant argues that, assuming that the evidence attached to his petition could not have been discovered through due diligence prior to final judgment, then defendant's petition substantially states a claim that his statements to the police were coerced and their use violated his right against self-incrimination and that newly discovered evidence excuses *res judicata*. Defendant asks this court, if it does not remand for a stage three hearing on his ineffective counsel claim, to reverse and remand for a new evidentiary hearing on his motion to suppress statements.

¶ 142   "The doctrine of *res judicata* bars consideration of issues that were previously raised and definitively settled by judicial decision." *People v. Montanez*, 2023 IL 128740, ¶ 103. Here, the trial court denied defendant's pretrial suppression motion and found that his statements were voluntary and not the product of physical coercion. His claim is thus barred by *res judicata*. *Id.* Although defendant acknowledges the previous ruling, he invokes "fundamental fairness" to relax this procedural bar.

¶ 143   Fundamental fairness requires that *res judicata* be relaxed, permitting re-examination of a claim where a defendant presents substantial new evidence. *Jackson*, 2021 IL 124818, ¶ 31; *Patterson*, 192 Ill. 2d at 139. Such evidence must have been (1) discovered since trial and not discoverable prior to trial by the exercise of due diligence, (2) material and not cumulative, and (3) of such conclusive character that it will probably change the result upon retrial. *Jackson*, 2021 IL 124818, ¶ 31; *Patterson*, 192 Ill. 2d at 139. Material means the evidence is relevant and probative, not cumulative means the evidence adds to what the fact finder heard, and conclusive means the evidence, when considered along with the hearing evidence, would probably lead to a

different result. *People v. Coleman*, 2013 IL 113307, ¶ 96 (discussing these terms in the context of a claim of actual innocence).

¶ 144   As discussed above, the 2018 Muhammad TIRC report and Cotton's allegations, which became available in 2014, were discovered after defendant's 2009 trial and were not discoverable prior to trial by the exercise of due diligence.

¶ 145   The Muhammad TIRC Report is a 2018 TIRC case disposition that investigated claims of abuse made by Muhammad and found sufficient credible evidence to merit judicial review. Muhammad alleged that he was interrogated at Area 2 in 1999 in connection with a fatal shooting. Detective Fidyk and his partner held Muhammad for four days, fed him only once during that time, and denied him bathroom use so that he urinated on the floor and defecated in his T-shirt. At one point, Detectives Fidyk's partner boasted that he knew how to get Muhammad to confess without leaving a mark and aggressively slammed a large casefile on the table. Detective Fidyk then left the room at his partner's request before the partner abused Muhammad by, *inter alia*, striking Muhammad's ears with his hand and hitting Muhammad's head several times with the casefile. Although TIRC voiced "serious reservations about Muhammad's credibility," TIRC nonetheless found sufficient evidence of torture. *In re Claim of Muhammad*, Ill. Torture Inquiry & Relief Comm'n Cl. No. 2014.256-M, at 2 (2018).

¶ 146   The Muhammad TIRC Report noted that Detective Fidyk was named in 10 complaints, 2 of which alleged that he participated in torture to secure a confession. In the second complaint, Cotton alleged that Detective Fidyk participated in beating him and that he was denied the use of a bathroom until he defecated on himself. Detective Fidyk's exact role in the abuse was not further

specified, and TIRC noted that IPRA administratively dismissed Cotton's complaint because it was made 12 years after the alleged torture. According to defendant, Cotton's allegations came to light in 2014, so it seems that his alleged torture occurred in 2002. See *People v. Cotton*, 393 Ill. App. 3d 237 (2009) (showing that Detective Fidyk was involved in the investigation of defendant Cotton, who was convicted of offenses that occurred in 2002).

¶ 147   The trial court stated that the Muhammad TIRC Report made only passing references to Detective Fidyk and not a single allegation of physical abuse against him. The trial court found that Muhammad's allegation was remote (four years before defendant's alleged abuse occurred) and completely factually distinguishable from defendant's allegations against Detective Fidyk. Moreover, the trial court stated that the allegation made by Cotton was dismissed because it was made 12 years after the fact. The trial court found that Cotton's complaint was legally insufficient on its face. The trial court found that, although the evidence in the Muhammad TIRC Report was not cumulative, it did not rise to the level of material evidence to show a pattern of abuse.

¶ 148   The State argues that even if the Muhammad TIRC Report and Cotton complaint had been available at the time of defendant's suppression hearing, it is not likely that they would have been admissible or changed the result of the suppression hearing if they had been admitted. The State contends that the Muhammad TIRC Report and Cotton complaint referenced therein lack probative value because Muhammad never alleged he suffered abuse at the hands of Detective Fidyk and the timing of Detective Fidyk's purported abuse of Cotton is not specified (see *Brandon*, 2021 IL App (1st) 172411, ¶ 74 (recognizing that prior abuse allegations were more relevant where they occurred in close temporal proximity to the defendant's purported abuse)). The State also

complains that Cotton's complaint did not result in a finding of wrongdoing against Detective Fidyk.

¶ 149　We find that the trial court abused its discretion when it found that Muhammad's and Cotton's allegations were not material. To the extent the trial court found no factual similarity in Muhammad's allegations against Detective Fidyk based on Detective Fidyk leaving the room at his partner's request before the partner physically abused Muhammad, the allegations show that Detective Fidyk was willing to cooperate in the coercion of a statement. Courts have held that relevant allegations in other cases can involve "committing acts of physical abuse *or failing to stop such abuse*." (Emphasis added.) *Orange*, 195 Ill. 2d at 455 (citing, *inter alia*, *King*, 192 Ill. 2d at 198); see *Whirl*, 2015 IL App (1st) 111483, ¶ 103 ("even if the new evidence established only that [the accused officer in the present case] stood by and did nothing while other officers committed acts of torture and abuse, silent acceptance is still relevant to the issue of whether [that officer's] credibility may have been impeached as a result of this evidence"). Moreover, both Muhammad and defendant alleged that Detective Fidyk held them for about four days and fed them only once during that time. Furthermore, like defendant, Cotton alleged that Detective Fidyk was one of the officers who participated in beating him to coerce a confession. Although Cotton's complaint was dismissed as untimely, here it is relevant as part of a series of incidents spanning several years to show a pattern and practice of abuse. *Brandon*, 2021 IL App (1st) 172411, ¶ 74.

¶ 150　We conclude that defendant made a substantial showing that Muhammad's and Cotton's allegations are material and, for the reasons discussed above regarding the prejudice prong of *Strickland*, are, in combination with the other relevant evidence of abuse and coercion attached to

defendant's petition and taking defendant's allegations as true, of such conclusive character to probably change the result of the suppression hearing and the trial.

¶ 151 As discussed above, we remand this cause for a stage three evidentiary hearing on defendant's claim of ineffective counsel. We make no comment on the weight of the evidence, nor do we suggest what the outcome of the hearing should be.

¶ 152                              C. Proportionate Penalties Clause

¶ 153 Initially, defendant argued that the court erred in dismissing his postconviction petition because he made a substantial showing that his mandatory natural life sentence violated the Illinois Constitution's proportionate penalties clause. Specifically, he argued that even though he was an 18-year-old adult at the time of the murders, he made a substantial showing that he is entitled to receive sentencing protections of the sort required for juveniles by *Miller v. Alabama*, 567 U.S. 460 (2012), due to the particular circumstances of his case. Those circumstances included that he was 18 years old and dependent on his parents who were at times unwilling or unable to house him, he had previously relied on his childhood friend Emmanuel for a place to sleep, defendant was explicitly threatened to remain quiet about the Perry family murders, Emmanuel planned and drove the attack on the Perry family, and defendant was terrified of Emmanuel, who was willing to kill for a stylish submachinegun and to settle scores for perceived slights.

¶ 154 The State responded that defendant's sentencing challenge is barred by *res judicata* because the trial court previously rejected his proportionate penalties sentencing claim. Moreover, even if his claim was not barred, he has failed to make a substantial showing that the natural life sentence he received as punishment for his role in the brutal quadruple homicide violates proportionate penalties principles.

¶ 155   However, in his reply brief, defendant states, and we agree, that his proportionate penalties clause claim is now definitively barred by the Illinois Supreme Court's February 2, 2023, decision in *People v. Clark*, 2023 IL 127273, ¶¶ 60-67, which was issued after the filing of defendant's December 13, 2022, initial brief. Accordingly, we need not address defendant's proportionate penalties claim.

¶ 156                                  III. CONCLUSION

¶ 157   For the foregoing reasons, we reverse the judgment of the circuit court and remand this matter for an evidentiary hearing under the Act.

¶ 158   Reversed and remanded.

---

## *People v. Johnson*, **2024 IL App (1st) 220419**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 03-CR-5227; the Hon. Michael B. McHale, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Benjamin Wimmer, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Brian K. Hodes, and Erin K. Slattery, Assistant State's Attorneys, of counsel), for the People. |

---