2024 IL App (1st) 230429-U

Fourth Division
Filed December 19, 2024

No. 1-23-0429

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) Appeal from the |
| Plaintiff-Appellee, | ) Circuit Court of Cook County |
| | ) |
| v. | ) No. 13 CR 0525101 |
| | ) |
| ANTONIO LEWIS, | ) The Honorable James B. Linn, |
| Defendant-Appellant. | ) Judge, presiding. |

JUSTICE OCASIO delivered the judgment of the court.
Presiding Justice Rochford and Justice Lyle concurred in the judgment.

**ORDER**

¶ 1   *Held:*   The second-stage dismissal of defendant's postconviction petition was affirmed where defendant failed to make a substantial showing that trial counsel was ineffective or that the State suppressed evidence favorable to the defense.

¶ 2   Defendant, Antonio Lewis, was found guilty of first-degree murder after a bench trial and sentenced to 70 years' imprisonment. Following his conviction, he filed a petition for postconviction relief claiming, among other things, that he was denied the effective assistance of counsel at trial and that the State (or its agents) failed to disclose evidence favorable to the defense before trial. The circuit court granted the State's motion to dismiss the petition, and Lewis appeals.

¶ 3                                    I. BACKGROUND

¶ 4      In 2013, Lewis was charged by indictment with first-degree murder in connection with the shooting death of Maurice Vortes on December 29, 2011. The case was tried before the court in February and March 2015. The evidence that was adduced at that bench trial is detailed in our decision on direct appeal. See *People v. Lewis*, 2018 IL App (1st) 160715-U, ¶¶ 4-46. In summary, it established that, shortly before 9 p.m. on December 29, 2011, Vortes—a member of the New Breeds gang who was also known as "Tiptoe"—was shot and killed by a masked assailant inside the Way Low liquor store, which was located at 1553 South Kedzie Avenue on the west side of Chicago. Security cameras located inside and outside the store captured footage of the shooting and of the shooter's movements in the minutes leading up to it. The case was assigned to Detectives Roger Sandoval and Carlos Cortez, but they were unable to immediately determine the shooter's identity. Eventually, two eyewitnesses—Lamar Thompson and David Jones—told police that Lewis was the shooter. Two other witnesses—Darrell Wilson and Freddie Warren—did not see the shooting, but they both told police that Lewis made inculpatory statements to them later that night. At trial, however, all four of them backed off of their pretrial statements to police, forcing the State to rely on their prior inconsistent statements to prove its case. See 725 ILCS 5/115-10.1 (West 2014).

¶ 5      Lamar Thompson testified that he and Vortes were both New Breed gang members. At the time of the shooting, he lived with his girlfriend in an apartment above the liquor store. That night, he was passing the time drinking, smoking, and socializing inside and on the sidewalk in front of the store. At some point, he saw Lewis come in, make a purchase, and then leave. Lewis was wearing light blue pants and a black jacket with a symbol on the back. Thompson further testified that, after Lewis left, a masked man wearing blue pants or light jeans and a black hoodie, with the hood covering his head, came into the store and shot Vortes in the face. At trial, Thompson was shown a series of still frames drawn from the store security footage from the night of the shooting. He identified Lewis in two frames depicting the sidewalk in front of the store at around 8:31 p.m.

He also identified the shooter in several frames depicting the interior of the store at 8:56 p.m., moments before the shooting, but he testified that he did not see Lewis in those frames.

¶ 6    Thompson acknowledged that, in February 2013, he identified a picture of Lewis in a photo array and then signed a written statement implicating Lewis. According to the written statement, which was introduced into evidence, Thompson told an assistant state's attorney that, about half an hour after making a purchase and leaving, Lewis returned to the store wearing the same jeans, a different coat, and a mask that covered everything except his nose and eyes. Per the statement, despite not being able to see the shooter's entire face, Thompson believed it was Lewis because the shooter "was the same height and weight" as Lewis and was wearing the same clothing.

¶ 7    Three days after signing the written statement, Thompson viewed a lineup but did not identify anybody in it. Thompson testified at trial that he "didn't recognize anyone," and he denied telling a detective that he was afraid that he would be retaliated against if he identified the shooter.

¶ 8    David Jones testified that, at the time of the shooting, he worked at Way Low. His shift that night was scheduled to start at 9:00 p.m., but he arrived about an hour early so he could drink and smoke marijuana before clocking in. At around 8:30 p.m., he saw Lewis, who was wearing blue jeans and a jacket, outside the store. He had known Lewis for about 15 or 20 years because they had grown up in the same neighborhood. They exchanged brief pleasantries, and then Lewis went inside, made a purchase, came back out, got in a car, and left. Later, at around 8:50 p.m., Jones saw a man wearing a mask come into the store. The masked man came up to him and said, "Don't get scared." He replied, "Get scared for what[?]" but the masked man walked away. Not long after, Jones went outside and saw the masked man enter the store holding a gun, and he heard three or four gunshots. Like Thompson, Jones was shown still frames from the security footage during his testimony. He identified Lewis in several frames taken outside the store at around 8:30 p.m. He testified that the masked man was visible in a series of frames captured inside and then outside the store between 8:53 p.m. and 8:57 p.m., but he denied seeing Lewis.

¶ 9    Jones testified that, in January 2012, police officers came to his house "[a]ggressively" and, against his will, took him to the police station. He spoke to Detectives Sandoval and Cortez,

told them that he did not know who the masked shooter was, and then went back home. He did not remember if he spoke to Lewis on the phone after being questioned. In February 2013, he was again taken to the station by officers, where he spoke to Detectives Sandoval and Cortez. Although the encounter was initially more friendly, one of the detectives "got aggressive" when he "wasn't cooperating" and threatened to charge him with murder, if only to take him away from his kids for two or three years.

¶ 10    Jones acknowledged that, in February 2013, he ultimately agreed to give a videotaped statement in which he identified Lewis as the shooter and said that Lewis was wearing the same jeans—pre-washed blue jeans with holes in them—that he had when he made his purchase earlier that night. In the statement, he also said that, after returning home after being questioned in January 2012, he received a phone call from Lewis, who told him to keep his mouth shut and that, if he did not say anything, he "shouldn't have anything to worry about." At trial, Jones agreed that he made those statements, but he testified that they were not true: by that point, he just wanted to go home, and "they were pointing [him] in the direction to go" and "coaching" him.

¶ 11    Jones also acknowledged that, a few days after giving his statement, he testified before a grand jury and related essentially the same facts; at trial, he maintained that, like his statement, his grand-jury testimony was not true.

¶ 12    Darrell Wilson testified that he was a member of the New Breeds. On the night of the shooting, he was hanging out with several people, including Lewis, four or five blocks away from Way Low. They were all smoking marijuana. Lewis left for ten or fifteen minutes without saying where he was going. When he returned, Lewis was wearing the same clothes. Wilson testified that he did not see Lewis with a gun that day and did not see him give anything to anybody.

¶ 13    Wilson acknowledged that, in February 2013, he testified in front of a grand jury. He told the grand jury that, the night of the shooting, Lewis went to Way Low to find Vortes, who had "opened up on [Way Low] selling drugs" even though he was not "supposed to be right there." Lewis was gone for about 30 minutes. When he came back, Lewis said, "I got him," which Wilson took to mean that Lewis had shot Vortes. Lewis then gave a black semiautomatic gun to somebody

named "Little Tony" and told him to "put it up." Before leaving, Lewis had been wearing blue jeans and a black shirt, but he returned wearing a black hoodie. At trial, Wilson testified that, at the time of his grand jury testimony, he was in a boot camp run by the Department of Corrections and the prosecutor was threatening to charge him with another case if he did not testify. He denied approaching law enforcement to make a deal for his testimony because he was in custody.

¶ 14    Freddie Warren testified that, on the night of the shooting, he was having a party at his house. About 50 people attended, but Lewis and two individuals known as "Little Jason" and "Red" were not among the guests. He denied knowing Darrell Wilson.

¶ 15    Warren acknowledged that, in February 2013, while he was in prison, he spoke to two detectives and an assistant state's attorney, but he denied making or signing a handwritten statement. When handed a document purporting to be such a statement, he testified that he did not recognize it. After one of the detectives who had been present for the interview testified that Warren had signed the statement, it was introduced into evidence.

¶ 16    The statement related that Warren was a member of the New Breeds. On the night of the shooting, Lewis came to a party at Warren's house wearing jeans and the jacket he was depicted wearing in a still frame taken from the Way Low's security footage. Lewis left for about 15 or 20 minutes and came back wearing a hoodie, which he took off, wrapped in a ball, and put in a bag. He heard Lewis say that he "knocked the code of silence off of [somebody's] face"—a reference to a New Breeds symbol that Vortes had tattooed on his face—which Warren took to mean that Lewis had shot somebody. After being shown video of the shooting, Warren recognized the gun as one that he had kept hidden in his backyard on behalf of the gang before it was traded away by someone named "Lil Jason" to someone named "Red" after the shooting.

¶ 17    Warren acknowledged testifying before a grand jury in March 2013 but denied saying anything contained in a transcript of his testimony, which was substantially similar to the written statement.

¶ 18    At the conclusion of trial, the court found Lewis guilty. It later sentenced him to 70 years' imprisonment. On direct appeal, we affirmed over his contentions that the trial judge harbored

preconceived notions about the veracity of prior statements given by witnesses who recant at trial and that his sentence was excessive. *Lewis*, 2018 IL App (1st) 160715-U, ¶¶ 50-66.

¶ 19      In 2019, through counsel, Lewis filed a postconviction petition alleging that he had been denied the effective assistance of counsel at trial and on direct appeal and that the State had violated its constitutional duty to disclose evidence that would have been favorable to his defense. The claims relevant to this appeal involve two sets of evidence that Lewis alleges could have been introduced at trial but were not.

¶ 20      First, the petition claimed that trial counsel was ineffective for not introducing evidence about the backgrounds of the lead detectives in this case, Roger Sandoval and Carlos Cortez. It alleged that a reasonable investigation would have uncovered that (1) the city had paid $100,000 to settle a federal civil-rights lawsuit where the plaintiff, an intellectually disabled woman named Yesenia Santiago, alleged that Sandoval and Cortez had coerced her into falsely confessing to a murder she could not possibly have committed, (2) the city had paid $99,000 to settle another federal civil-rights lawsuit naming more than a dozen officers, including Sandoval, alleging that unnamed detectives had, through threats and violence, coerced two witnesses to implicate a murder suspect in a different case, (3) Sandoval had been the subject of 38 misconduct complaints, three of which (two involving the use of force and one involving lock-up procedures) were sustained, and (4) Cortez had been the subject of 37 misconduct complaints, one of which (for a personnel violation) was sustained. Alternatively, the petition claimed that the State had violated its obligations under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), by not disclosing this information before trial. The petition supported these allegations with printouts of the detectives' disciplinary histories as reported by the Civic Police Data Project and what purported to be a copy of the complaint filed in the Santiago suit. The petition also cited, but did not attach, a website operated by *The Chicago Reporter* summarizing the allegations in both lawsuits and stating the settlement amounts. See The Chicago Reporter, *Settling for Misconduct*, https://projects.chicagoreporter.com/settlements (last visited Nov. 20, 2024).

¶ 21    Second, the petition claimed that trial counsel was ineffective for not calling as witnesses three friends of Lewis's who were named by Warren as guests at his party on the night of the shooting: Jason Juarez, known as "Little Jason"; Christopher Turnipsed, known as "JJ"; and Darius Finley, known as "Daz." All three signed notarized affidavits, which were attached to the petition, that contradicted some aspects of the State's case.

¶ 22    According to Juarez's affidavit, Warren's claim that he was at a party on the date of the shooting and gave a gun to somebody was a lie. He explained that the party he went to was a New Year's Eve party; it did not take place on December 29. He denied giving a gun to anybody at the party, knowing anybody who went by the name "Red," getting a gun from Lewis, or hearing Lewis say anything about shooting anybody. Juarez said that he "would be surprised if Freddie [Warren] remember anything from back then" because Warren "was smoking PCP at the time." Juarez also stated that, at the time of the shooting, "there was not any beef" amongst the New Breeds, who "were not fighting over drug territory" at the time. Although he did not know who "controlled" the block the liquor store was on, he specifically averred that he knew that Lewis "wasn't into it with anyone about the territory around Way Low." Juarez stated that trial counsel never reached out to him or asked him to testify.

¶ 23    Turnipsed's affidavit was substantially similar to Juarez's. He stated that he did not attend a party at Warren's house on the night of the shooting. Instead, he and Lewis went to a party there two nights later, on New Year's Eve, although he was not sure whether Wilson was there. He averred that he did not see Lewis with a gun at the party or hear him talk about shooting anybody at the party or otherwise. Like Juarez, Turnipsed asserted that, around the time of the shooting, Warren frequently smoked PCP and "couldn't remember much" after using it. He speculated that Warren was confused about the date of the party. Turnipsed said that he was not aware of "any war between the New Breeds going on in 2011 over territory" and that Lewis never expressed that he was "mad over territory[,] especially not over *** where Way Low is located." Finally, he averred that trial counsel had not contacted him to testify and that, had he been asked, he would have.

¶ 24    In his affidavit, Finley stated that, between September 19, 2011, and January 19, 2012, he was in "boot camp" at the county jail. After Lewis was charged, he told Finley that Warren had put him at a party on the night of the shooting. Finley told trial counsel that he could not have been at the party because he was in boot camp. Counsel asked him if he would be willing to testify, and Finley said he would, but "never said anything else about it" even though Finley attended Lewis's trial.

¶ 25    After the petition survived first-stage summary review, the State moved to dismiss it. Among other things, the State argued that the evidence attached to the petition was insufficient to support Lewis's claim that trial counsel was ineffective for failing to introduce evidence of a purported pattern of misconduct by Detectives Sandoval and Cortez. The State pointed out that the attachments to the petition did not "detail[ ] any findings against either detective" or identify the dates of any findings to show that they were made before trial. Addressing the related *Brady* claim, the State identified additional deficiencies, including that the version of the Santiago complaint attached to the petition did not bear a filing date and that the petition was not supported by a copy of the complaint in the other lawsuit. Lewis's response to the motion to dismiss did not include any additional evidentiary material.

¶ 26    After a hearing, the circuit court granted the motion to dismiss. Lewis now appeals.

¶ 27                            II.  ANALYSIS

¶ 28    On appeal, Lewis argues that the circuit court erred by granting the State's motion to dismiss his petition. He contends that the circuit court should not have dismissed his claims that trial counsel was ineffective with respect to Sandoval and Cortez's history of misconduct and for failing to impeach Warren's and Wilson's pretrial statements. He also contends that the circuit court should not have dismissed his claim that the State's failure to disclose Sandoval and Cortez's history was a breach of its *Brady* obligations.

¶ 29    A motion to dismiss "tests the legal sufficiency of the petition." *People v. Domagala*, 2013 IL 113688, ¶ 35. It asks whether the petition's allegations, if shown to be true at an evidentiary

hearing, would establish a violation of the petitioner's constitutional rights. *Id.* In other words, the court must determine "whether the petition's allegations sufficiently demonstrate a constitutional infirmity which would necessitate relief." *People v. Coleman*, 183 Ill. 2d 366, 380 (1998). In making that determination, a court liberally construes the petition's allegations and takes as true all well-pleaded facts. *Id.* at 381-82. Supporting affidavits are also deemed to be true. See *id.* at 382 (citing *People v. Wegner*, 40 Ill. 2d 28, 31-32 (1968)). As the purpose of the pleadings is only to evaluate whether the claims require a hearing, the court should not engage in any fact-finding at this stage. *Id.* The motion to dismiss should only be granted if the allegations "fail to make a substantial showing of imprisonment in violation of the state or federal constitution." *Id.* A motion to dismiss presents a question of law, so our review is *de novo*. *Id.* at 388.

¶ 30                          A.  Ineffective Assistance

¶ 31    We begin with Lewis's arguments that his petition made a substantial showing that he was denied his right to the effective assistance of counsel. The United States Constitution and Illinois Constitution both guarantee criminal defendants the right to counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. That right includes the right to the effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). Where, as here, it is counsel's own errors that allegedly denied effective assistance, the defendant must show that counsel's performance was both deficient and prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *accord People v. Albanese*, 104 Ill. 2d 504, 525 (1984). To establish deficient performance, "the defendant must show that counsel's representation fell below an objective standard of reasonableness" by overcoming "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 687-88. To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. This does not require a showing that it is more likely than not that counsel's errors changed the outcome. *Id.* at 693-94. It requires only that the likelihood of a different result is significant enough "to undermine confidence in the

outcome." *Id.* at 694. In applying these standards, we do not treat them as "mechanical rules." *Id.* at 696. "[T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." *Id.* The decisive question is whether "the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Id.*

¶ 32                              1. The Detectives' Alleged Misconduct

¶ 33    Lewis first argues that counsel was ineffective for not introducing at trial evidence showing Detectives Sandoval's and Cortez's alleged history of misconduct. Because a "claim of ineffective assistance cannot be sustained on the basis of counsel's failure to offer inadmissible evidence," a threshold question is whether evidence of this alleged history would even have been admissible at trial. *People v. Denson*, 250 Ill. App. 3d 269, 281 (1993).

¶ 34    Like all other bad-acts evidence, allegations that police officers engaged in other acts of abuse and coercion are not admissible to show a propensity to abuse or coerce. *People v. Johnson*, 2024 IL App (1st) 220419, ¶ 77; see Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). Such allegations are, however, admissible for any other relevant purpose. *Johnson*, 2024 IL App (1st) 220419, ¶ 77 (citing *People v. Patterson*, 192 Ill. 2d 93, 114-15 (2000)). Here, Lewis argues that the evidence he relies on would have shown that Detective Sandoval and Cortez had engaged in "a pattern and practice of coercing false information," which would have been relevant at his trial "to impeach the officers and support the testimony of Jones and Wilson that they had been coerced, and Thompson and Warren that they gave prior false statements." He also suggests that this evidence would have been admissible to show the detectives' intent, plans, and motivations while interrogating witnesses.

¶ 35    The Illinois Supreme Court has recognized that "a pattern and practice" of police misconduct may be found admissible at criminal trials if relevant. See *People v. Jackson*, 2021 IL 124818, ¶ 32. When assessing whether past incidents would have probative value, "the critical inquiry is simply whether there is sufficient similarity between the misconduct at issue in the

present case and the misconduct shown in other cases, such that it may fairly be said the officers were acting in conformity with a pattern and practice of behavior." *Id.* ¶ 34. Evidence of misconduct may be found "relevant and admissible where the prior incidents involved the same officer and similar methods." *Johnson*, 2024 IL App (1st) 220419, ¶ 78. "In contrast, prior dissimilar and stale allegations of abuse are irrelevant and inadmissible." *Id.* ¶ 79. Generalized allegations of coercive activity at a particular police station are not considered relevant. *Id.* (citing *Patterson*, 192 Ill. 2d at 115). Allegations may be relevant even if not accompanied by an official finding of wrongdoing. *Id.* ¶ 81; *accord People v. Anderson*, 2024 IL App (1st) 200462-B, ¶ 191.

¶ 36    Here, Lewis argues that the evidence he alleges would have been uncovered by a competent investigation establishes that Detectives Sandoval and Cortez engaged in a pattern and practice of coercing witnesses into providing false inculpatory testimony. Specifically, he contends that trial counsel should have discovered and then used at trial the detectives' disciplinary history and the allegations of two federal civil-rights complaints involving one or both detectives that were settled out of court: Belcher *et al.* v. City of Chicago *et al.*, No. 08-cv-5411 (N.D. Ill. dismissed Oct. 9, 2012), and Santiago v. City of Chicago *et al.*, No. 14-cv-8205 (N.D. Ill. dismissed Sep. 11, 2015).[1]

¶ 37    We are not persuaded that the detectives' disciplinary records would have even helped to show a pattern and practice of witness coercion. Sandoval's history lists 38 allegations, of which three were sustained. But most of those allegations—including all three sustained allegations—predated his promotion to detective in September 2000. Similarly, all but five of Cortez's 37 allegations predated his November 2004 promotion to detective. And the allegations themselves are bereft of any detail beyond bland categorizations such as "Illegal Search," "Use Of Force," or "False Arrest." They provide no basis for assessing whether the underlying incidents bore even

---

[1]    We take judicial notice of dockets in these cases, which reflect their dispositions. See *NBD Highland Park Bank, N.A. v. Wien*, 251 Ill. App. 3d 512, 520 (1993) ("It is well settled that public documents that are included in the records of other courts and administrative tribunals may be the subject of judicial notice.").

superficial similarity to the detectives' alleged misconduct in this case. They are not probative of any pattern or practice of pressuring eyewitnesses into making false identifications.

¶ 38     Lewis also fails to show that any allegations in the Belcher case would have been relevant at trial. The petition does not have attached to it any evidence concerning that case; instead, it provides a link to a capsule summary of the allegations found on the website of the *Chicago Reporter*. Putting aside the question of whether Lewis can properly rely on this material, it is an improvement over the disciplinary histories in that it provides details about alleged misconduct. For instance, it states that a witness "was placed in a locked interrogation room and told to implicate" a specific individual and that, after the witness said she had not seen that person on the day of the shooting under investigation, "[t]he detective shouted obscenities at [her] while threatening her with criminal prosecution if she refused to testify." The capsule summaries do not, however, attribute specific misconduct to any particular officer, making it impossible to determine what wrongdoing, if any, Sandoval was alleged to have engaged in as opposed to one of the fifteen other "officers named" in the suit. See *Jackson*, 2021 IL 124818, ¶ 36 (finding that civil complaint in which two detectives were named as parties but contained no allegations "specific to either of them" lacked probative value).

¶ 39     That leaves the Santiago case. The allegations in that matter are set out in the complaint attached to Lewis's petition.[2] Unlike the disciplinary histories, the Santiago complaint contains some details about the alleged misconduct, and unlike the Belcher summary, it attributes that misconduct to Detectives Sandoval and Cortez. The Santiago complaint alleges, among other things, that the manner of her interrogation "was coercive and intimidating" and that the detectives "fed [her] information about the crime." In a broad sense, those allegations are similar to Jones's

---

[2]     The State observes on appeal that the copy of the Santiago complaint attached to Lewis's petition did not bear a filestamp, but it did not raise that defect in the circuit court, which denied Lewis the opportunity to amend the petition with a filestamped copy and forfeited any objection to the absence of a filestamp. See *People v. Cowart*, 2015 IL App (1st) 131073, ¶ 11 ("The State forfeits a nonjurisdictional procedural challenge to a postconviction petition when it fails to raise that challenge in a motion to dismiss.").

testimony at trial that, when he went to the police station in February 2013, one of the detectives "got aggressive" and that the detectives "were pointing [him] in the direction to go" and "coaching" him. The problem for Lewis is that the Santiago case stands alone. He has presented no evidence that Sandoval or Cortez have, on some other occasion, used pressure and aggression to induce a false statement, be it an identification or a confession. We agree in principle that, under the right circumstances, "[e]ven one incident of similar misconduct by the same detectives can be sufficient." *People v. Tyler*, 2015 IL App (1st) 123470, ¶ 186 (citing *People v. Banks*, 192 Ill. App. 3d 986, 994 (1989)). But the only case which the parties have directed our attention to where a single past incident, as opposed to a series of incidents, was found admissible is *Banks*, where the prior incident was "virtually identical" to the circumstances of the defendant's interrogation: both incidents involved detectives beating the interrogees with a flashlight and putting bags over the interrogees' heads. *Banks*, 192 Ill. App. 3d at 988, 993-94. We are unable to say that the alleged misconduct in this case was similar enough to the alleged misconduct in the Santiago case as to make it fair to say that, in both instances, the detectives "were acting in conformity with a pattern and practice of behavior." *Jackson*, 2021 IL 124818, ¶ 34.

¶ 40 Because none of the evidence Lewis identifies as showing that Detectives Sandoval and Cortez engaged in a pattern and practice of misconduct would have been admissible at trial, it follows that counsel's failure to present that evidence at trial could not have been ineffective.

¶ 41                                         2.  Impeachment Witnesses

¶ 42 Lewis next argues that trial counsel was ineffective for failing to call Juarez, Turnipsed, and Finley to testify at trial. We choose to first consider whether that failure was prejudicial. See *Strickland*, 466 U.S. at 697 ("[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies."). The question is whether, had defense counsel called Juarez, Turnipsed, and Finley to testify, it is reasonably probable that "the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695. To answer this question, we consider the totality of

the evidence presented at trial and determine the effect that this additional evidence might have had on the findings. *Id.* Because we are still at the pleadings stage of the postconviction proceedings, where the petition's allegations and supporting evidence are taken as true, we assume that the trier of fact would have credited Juarez, Turnipsed, and Finley's testimony. *Coleman*, 183 Ill. 2d at 382.

¶ 43 The State's case ultimately rested on the testimony of two occurrence witnesses, Thompson and Jones, who identified Lewis as the shooter before trial. Those identifications were corroborated by Wilson's and Warren's testimony about what Lewis did and said on the night of the shooting. Those identifications were also corroborated by the surveillance footage, which confirmed that Thompson and Jones were in a position to identify the shooter and revealed that the pants Lewis wore that night closely resembled those worn by the shooter.

¶ 44 Had counsel called Juarez, Turnipsed, and Finley, they would have contradicted Warren's pretrial account of the night of the shooting, which asserted that he hosted a party that they, along with Lewis, all attended. If there was no party, then Lewis cannot have left it, returned to it, or bragged to other partygoers about having just killed somebody. If credited, their testimony would have essentially negated Warren's pretrial statements. Juarez and Turnipsed, moreover, would have testified that, to their knowledge, there was not any intra-gang conflict at the time over drug territory or who had control of the block where the liquor store was located. Juarez would also have specifically testified that Lewis "wasn't into it with anyone about the territory around Way Low." If believed, this testimony would have undermined the State's theory that the shooting was motivated by just such a dispute. Although motive is not an element of first-degree murder, the fact that the defendant had a reason to want the victim dead is probative of identity because it makes it more likely that the defendant was responsible for the killing. *People v. Rudd*, 2020 IL App (1st) 182037, ¶ 50 (citing *People v. Smith*, 141 Ill. 2d 40, 56 (1990)). However, neither the alleged misconduct of the detectives nor the uncalled witnesses would have undermined either Thompson's or Jones's pretrial identifications of Lewis as the shooter. It also would not have undermined Wilson's corroborative account of the night of the shooting or the security footage that

showed the striking resemblance between the pants worn by Lewis when he made a purchase and by the shooter less than half an hour later.

¶ 45    The question becomes how discrediting Warren's pretrial statements and the State's motive theory would have affected the trier of fact's evaluation of the evidence. As this was a bench trial, we have the benefit of the trial judge's statements about the process by which he found Lewis guilty. See *People v. Erickson*, 161 Ill. 2d 82, 91 (1994) ("Just as importantly, the assessment may include 'evidence about the actual process of decision' if that evidence is a part of the record of the proceedings being reviewed.") (quoting *Strickland*, 466 U.S. at 695). In his findings, the trial judge discussed the fact that Wilson, Jones, Thompson, and Warren had all "approached the matter" differently on the witness stand at trial than they had previously. He attributed the witnesses' changed stories to their fear of facing gang retribution:

> "I cannot turn a blind eye to what is going on in this case. There is not a question in my mind that the New Breed street gang is terrorizing the neighborhood. They were terrorizing the neighborhood in December of 2011, and they are terrorizing the neighborhood during the course of this trial.
>
> I saw witnesses that would come into court that were horrified and terrified, and they still are all around. They still have to live where they live. They are still in the neighborhood. They have got to do what they need to do to cope and stay out of [harm's] way to the extent they can, and they performed on the witness stand as was brought out.
>
> * * *
>
> I'm looking at all of it in its totality. The New Breeds I think did all they could in December of 2011 to maintain things they wanted to, and they were trying to do so during the course of this trial as well because the witnesses were obviously horrified and terrified about what may happen."

The judge also found that all four witnesses' pretrial statements were mutually corroborating[3]:

> "I also had the benefit of seeing videotaped confession [*sic*] and signed statements of these witnesses all consistent with each other about what was going on and what happened that day. They all know the defendant. They saw what was happening. They knew why things were happening, and the statements are wholly corroborative of each other. They back each other up in all types of details about motive and knocking off—the code of silence off Mr. Vortes' face, which he happened to have literally tattooed on his face."

Finally, the judge concluded that the witnesses' pretrial statements were consistent with what was shown on the surveillance video:

> "It's overwhelming. Everything is corroborated by the videotape. I saw it, including the pants that the defendant was wearing. The Government has met their burden of proof. He is [ ] guilty beyond a reasonable doubt of all counts."

The record, therefore, shows that the evidence presented at Lewis's trial convinced the judge that (1) the shooting was gang-motivated, (2) the witnesses' reluctance to testify at trial was attributable to their fear of gang retaliation, (3) the witnesses' pretrial statements were mutually corroborating, and (4) the witnesses' pretrial statements were also corroborated by the videotape's depiction of Lewis and, later, the shooter.

¶ 46    The only one of these four points that might have been significantly affected by the proposed testimony of Juarez, Turnipsed, and Finley was the theory that the shooting was motivated by an intra-gang dispute over drug-selling territory. By contrast, their testimony would

---

[3]    We note that the judge did not expressly acknowledge that, although Wilson and Warren both put Lewis—and his inculpatory statements—somewhere on the 1300 block of South Christiana Avenue on the night of the shooting, Wilson said that they were out in the street, while Warren said that they were inside his house, including his kitchen.

not have reduced the force of the inference that the witnesses' reluctance to testify at trial was attributable to a fear of retaliation. Discrediting Warren's testimony would have reduced the degree of mutual corroboration to some extent, but both Thompson's and Jones's identifications would still have been corroborated by the other's and by Wilson's pretrial statements about what Lewis did on the night of the shooting. And the proposed testimony would have had no impact whatsoever on the strength of the video footage, which also corroborated Thompson's and Jones's identifications. Moreover, none of the evidence counsel failed to present was exonerating. Neither Juarez, Turnipsed, nor Finley would have identified a different person as the shooter or provided an alibi for Lewis at the time of the shooting. Their testimony would only have impeached a witness whose testimony was itself merely corroborative of the critical witness identifications.

¶ 47   To establish prejudice, Lewis must show that, but for counsel's errors, the possibility that he would have been acquitted is substantial enough to "undermine confidence in the outcome" because there was "a breakdown in the adversarial process that our system counts on to produce just results." *Strickland*, 466 U.S. at 694, 696. Here, the testimony that counsel failed to offer would have slightly diminished the strength of the State's case, but it would not have undermined either pretrial identification of Lewis as the shooter by two eyewitnesses who knew him. The likelihood that hearing from Juarez, Turnipsed, and Finley would have altered the trier of fact's conclusion that there was "overwhelming" evidence that Lewis was the shooter is minimal, and it is not so significant as to undermine confidence in the finding of guilt. Accordingly, Lewis failed to make a substantial showing that he was prejudiced by counsel's allegedly deficient conduct, so the circuit court correctly granted the State's motion to dismiss as to this claim.

¶ 48                                  B. *Brady*

¶ 49   Lewis also argues on appeal that he made a substantial showing that the State violated its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose the information discussed above about Detective Sandoval's and Detective Cortez's alleged misconduct in other cases. In *Brady*, the United State Supreme Court held "that the suppression by the prosecution of

evidence favorable to an accused *** violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87.[4] Because due process is only violated when the prosecution suppresses evidence, the *Brady* duty to disclose " 'does not apply to evidence not in the possession of the government that a defendant would have been able to discover himself through reasonable diligence.' " *People v. Gomez-Ramirez*, 2021 IL App (3d) 200121, ¶ 20 (quoting *United States v. Tadros*, 310 F.3d 999, 1005 (7th Cir. 2002)). Here, the Santiago and Belcher complaints are court filings and, therefore, public information to which the defense had access. *People v. Snow*, 2012 IL App (4th) 110415, ¶¶ 39-40. The summary of the detectives' disciplinary complaints attached to the petition is available online, as are the two articles about Santiago's exoneration cited in the petition. Because the State had no duty to disclose any of this publicly available information, Lewis failed to make a substantial showing of a *Brady* violation, and the circuit court properly dismissed this claim.

¶ 50                                    III.  CONCLUSION

¶ 51      We hold that Lewis's postconviction petition did not make a substantial showing that he was denied either his right to the effective assistance of trial counsel or his due-process right to the disclosure of evidence that would be favorable to the defense. Accordingly, we affirm the circuit court's judgment dismissing Lewis's petition on the State's motion.

¶ 52      Affirmed.

---

[4]   As originally articulated, the *Brady* rule applied only to favorable evidence requested by the accused, but the duty to disclose was later recognized to apply even if no request for it was made. See *Kyles v. Whitley*, 514 U.S. 419, 432-33 (1995) (tracing history of the rule).